MAERSK, INC., and Moller–
Maersk A/S, Plaintiffs,

v.

NEEWRA, INC., Rednihom, Inc., Aref Hassan Abul Inc., Arween Singh Sahni a/k/a Arween Sahni Singh a/k/a Arween Sahni a/k/a Arween Singh a/k/a Abul Sabah a/k/a Aref Hassan Abul, Mohinder Singh Sahni a/k/a Mohinder Sahni Singh a/k/a Mohinder Sahni a/k/a Mohinder Singh a/k/a Mohinder Singh Sahani a/k/a Mohinder Sahani a/k/a Mohinder Sahani Singh a/k/a Joginder Singh Sahni, Joginder Singh Sahni a/k/a Joginger Singh Sahni a/k/a Joginder Sahni Singh a/k/a Joginger Sahni Singh a/k/a Joginder Singh a/k/a Joginder Sahni a/k/a Joginger Singh a/k/a Joginger Sahni, Sabharwal Chandra Kumar a/k/a Sabharwal K. Chandra, Mandeep Singh Sahni a/k/a Mohinder Singh a/k/a Mo-

hinder Sahni a/k/a Mohinder Singh Sahni a/k/a Mohinder Sahani a/k/a Mohinder Singh Sahani, Help Line Collection Co. W.L.L., Parker Dawood Tajuddin Tajudis Ismail Parker, Sardar Traders Est., Sardar International Trading Co., Al Tamasok Al Arabi Est., John Doe 1–100 (fictitious) and John Doe Inc. 1–100 (fictitious), Defendants.

No. 05 Civ. 4356(CM).

United States District Court,
S.D. New York.

March 27, 2008.

DECISION AND ORDER DENYING DEFENDANTS MOHINDER, JO-GINDER, PARKAR, AND HELP-LINE'S MOTIONS TO DISMISS, AND GRANTING DEFENDANTS SARDAR AND SARDAR INTER-NATIONAL'S MOTION TO DIS-MISS

McMAHON, District Judge:

I. Introduction

The present case arises out of a series of international shipping frauds, allegedly perpetrated by now defunct New York corporations against A.P. Moller–Maersk A/S and its New York affiliate, Maersk, Inc. The New York-based fraudsters have flown the coup, and Plaintiffs are in the process of obtaining a default judgment as to them. Additionally, however, Plaintiffs allege that the remaining named Defendants were all participants, either as principals or co-conspirators, in the alleged frauds. Defendants, who are Indian nationals residing in Kuwait (or Kuwaiti businesses allegedly operated by these Defendants), move to dismiss the complaint against them for, inter alia, lack of personal jurisdiction and *forum non conveniens.*

For the reasons discussed below, these motions are granted as to Sardar Traders

Est. and Sardar International Trading Co., and denied as to everyone else.

## II. Background

This case has a complicated history, due both to the nature of the alleged schemes and the lengthy prior litigation. The exposition below is organized as follows: II.a. Parties; II.b. Frauds; II.c. Litigation History.

### a. *Parties*

#### i. Plaintiffs

Plaintiffs in this action are A.P. Moller–Maersk A/S and Maersk, Inc., together one of the world's largest shipping companies. Moller–Maersk is a foreign corporation organized under the laws of Denmark. Compl. ¶ 4. Maersk, Inc. is a New York corporation and affiliate of Moller–Maersk. *Id.* ¶ 3.

#### ii. Defendants

The Defendants are a variety of persons and businesses, with citizenships and residences across the globe.

The general nature of the allegations against the Defendants is as follows: according to Maersk, the New York Defendants, including the younger generation of the Singh Sahni family and a number of "dummy" corporations that they established in New York, were half of an international shipping scheme. These New York Defendants allegedly arranged for the transport of at least three shipments to India and Kuwait.

The Kuwaiti Defendants, including the older generation of the Singh Sahni family, were allegedly on the receiving end of some of these shipments in Kuwait, and assisted the New York Defendants by obtaining a fraudulent bill of lading and pursuing the New York Defendants' fraudulent claims against Maersk in the Kuwaiti courts.

The various frauds against Maersk, it alleges, are part of a larger international fraud conspiracy conducted by members of the Singh Sahni family and their cohorts abroad. The combination avoids detection, it is alleged, by shifting identities, establishing dummy corporations, bribing government officials and intimidating potential witnesses against it.

In order to keep this tangled scheme straight, I have divided the Defendants into New York Defendants and Kuwaiti Defendants below.

#### 1. New York Defendants
##### a. Neewra, Inc. ("Neewra")

Neewra was organized as a New York corporation, but was dissolved by proclamation of the State of New York for failure to pay taxes. While this litigation was pending, Neewra once again became an active New York corporation by paying past due taxes. Compl. ¶ 8. In the process of reviving its existence, Neewra listed a fictitious address. *Id.* Neewra does not appear to have a valid address or phone number anywhere in New York or elsewhere.

##### b. Rednihom, Inc. ("Rednihom")

Rednihom was organized as a New York corporation, but, like Neewra, was dissolved by proclamation of the State of New York in 2003 for failure to pay taxes. *Id.* ¶ 9. Also like Neewra, Rednihom does not appear to have a valid address or phone number. Rednihom has not revived its existence by paying its back due taxes.

##### c. Aref Hassan Abul, Inc. ("Aref")

Aref was also a New York corporation that was dissolved by failure to pay taxes. It does not currently have a valid address or phone number. *Id.* ¶ 10.

d. Arween Singh Sahni ("Arween")

Neewra and Aref (and perhaps Rednihom) were formed and operated by Arween Singh Sahni, an Indian national whose current residence is unknown. *Id.* ¶ 11. During the course of the conduct complained of, Arween resided and did business in New York and New Jersey, largely through Aref and Neewra. Arween has not appeared in response to this lawsuit and apparently cannot be found. *Id.*

Arween is the son of Joginder Singh Sahni, and the nephew of Mohinder Singh Sahni. He is the cousin of Mandeep Singh Sahni. These four members of the Singh Sahni family are all named as defendants here.

e. Mandeep Singh Sahni ("Mandeep")

Mandeep Singh Sahni is an Indian national who, during all relevant times, resided in the New York. Mandeep is alleged to have helped form Rednihom Inc. by impersonating his father, Mohinder Singh Sahni. *Id.* ¶ 16. Mandeep is also alleged to have helped Arween conduct the fraudulent business transactions complained of through Rednihom and to have done so while posing as his father. Like Arween, Mandeep has not appeared in response to this suit, and apparently cannot be found. *Id.*

Together, Arween and Mandeep are the younger generation of Singh Sahnis named by Maersk in the complaint. Mandeep and Arween are cousins, and the sons of Mohinder Singh Sahni and Joginder Singh Sahni, respectively.

2. Kuwait Defendants

a. Mohinder Singh Sahni ("Mohinder")

Mohinder Singh Sahni is a 69 year-old Indian national residing in Kuwait. *Id.* ¶ 12. Although "Mohinder Singh Sahni" was listed as a principal of the New York corporations (i.e., Neewra and Rednihom), it has been determined that this was not Mohinder, but either his son Mandeep or his nephew Arween posing as Mohinder. *See Maersk, Inc. v. Neewra, Inc.*, 443 F.Supp.2d 519, 522 (S.D.N.Y.2006) (RCC) (The data on the age and location of the "Mohinder" acting through Rednihom in New York "limits, if not eliminates, the possibility" that this was the real Mohinder, who is now moving to dismiss).

Mohinder is alleged to be involved in various businesses in Kuwait, including Sardar Traders Est., Sardar International Trading Co., and al Tamasok al Arabi Est., all of which are named Defendants here. Compl. ¶ 12. Apart from his alleged involvement in the various frauds, Mohinder does not appear to have any ties to the United States, although he admits having passed through New York en route to Canada on a couple of occasions. Mohinder Decl. ¶ 8.

b. Joginder Singh Sahni ("Joginder")

Joginder Singh Sahni is an Indian national residing in Kuwait. He is alleged to be involved in various businesses in Kuwait, including Help Line Collection Co., Sardar Traders Est., Sardar International Trading Co., and al Tamasok al Arabi Est., all of which are named Defendants here. Compl. ¶ 14. Apart from his alleged involvement in the frauds, Joginder does not appear to have any ties to the United States.

c. Dawood Tajuddin Parkar ("Parkar")

Parkar is an Indian national living in Kuwait. *Id.* ¶ 18. Parkar describes himself as a friend of Arween. Parkar Decl. ¶ 4. Parkar admits helping to pursue Neewra's claim against Maersk (see below) in Kuwait. *Id.* Parkar is alleged to be involved with various businesses in Kuwait, including Help Line Collection Co., a named Defendant here. Compl. ¶ 18.

Apart from his alleged involvement in the events leading to this lawsuit, Parkar does not appear to have any ties to the United States.

#### d. Sabharwal Chandra Kumar ("Sabharwal")

Sabharwal is an Indian national who previously resided in Kuwait, but whose present location is unknown. *Id.* ¶ 15. He is alleged to be an employee of either Mohinder or Joginder in Kuwait. *Id.* Apart from his alleged involvement in the events leading to this lawsuit, Sabharwal does not appear to have any ties to the United States.

#### e. Al Tamasok al Arabi Est. ("Al Tamasok")

Al Tamasok, a foreign corporation headquartered in Kuwait, is in the business of importing an exporting. *Id.* ¶ 21. Its owner, Dr. Adel Baroud, has disappeared. *Id.* Al Tamasok is alleged to have assisted the New York Defendants in various fraudulent transactions, and to be ultimately controlled by the Singh Sahni family in Kuwait. *Id.* Apart from its alleged involvement in the events leading to this lawsuit, al Tamasok does not appear to have any ties to the United States. Al Tamasok has not appeared in response to this lawsuit.

#### f. Help Line Collection Co. W.L.L. ("Help Line")

Help Line is a foreign corporation with an office in Kuwait. *Id.* ¶ 17. Help Line apparently assists with the collection of debts. Al Asoosi Decl. ¶ 5. It is alleged that either Mohinder or Joginder owns or operates Help Line, and that Help Line assisted Neewra in its various fraudulent schemes. Compl. ¶ 17. As noted, Help Line allegedly employed, or was employed by, Parkar. Apart from its alleged involvement in the events leading to this lawsuit, Help Line does not appear to have any ties to the United States.

#### g. Sardar Traders Est. ("Sardar") and Sardar International Trading Co. ("Sardar Int'l")

Sardar and Sardar Int'l are foreign corporations headquartered in Kuwait, in the business of auto parts and tires. *Id.* ¶ 19–20. It is alleged that Sardar and Sardar Int'l are owned or operated by Mohinder or Joginder. *Id.* The relationship between the companies and the Singh Sahni family appears to be the only connection these companies have to this lawsuit, as the Sardar companies are not alleged to have played a role in the frauds complained of (see below). Sardar and Sardar Int'l do not appear to have any ties to the United States.

### b. *Frauds*

With the major players identified, I now turn to the conduct that gives rise to Maersk's complaints against the Defendants. The basis of this lawsuit is a series of frauds and attempted frauds allegedly perpetrated by Arween and Mandeep, with the help of the Kuwaiti Defendants, against Maersk. These frauds are also the predicate offenses for a claim of civil RICO against the Defendants.

#### i. Tire Fraud

The first fraud complained of by Maersk involved the shipment of used tires from the United States to India ("Tire Fraud"). Plaintiffs allege that in late April 2001, Arween, on behalf of his company Aref, requested a price quote from Maersk on the shipment of 720 container loads of used auto and truck tires to India. Compl. ¶ 28. Plaintiffs also allege that Mandeep, posing as Mohinder and acting through Rednihom, sought a similar arrangement with other international shipping lines. *Id.* ¶ 30.

Plaintiffs allege that Aref obtained the used tires by contacting numerous facilities in New York, New Jersey, and elsewhere, and offering to dispose of their stockpiles by shipping the tires to interested buyers in India. *Id.* ¶ 33. Used tires, depending on their composition, qualify as solid hazardous waste under U.S. law, and hence are costly to dispose of.

On or about May 2, 2001, Maersk, Inc. and Aref agreed to a service contract whereby Aref would deliver approximately 720 containers of tires to Maersk and Maersk would ship the containers to India in groups over time. *Id.* ¶ 31. The consignee of record in India, Golden Traders, would then pay Maersk on a freight collect basis (i.e., pay the cost of the ocean freight before receiving the cargo). *Id.* ¶¶ 28, 38.

Plaintiffs allege that they received 260 containers from Aref for the Tire Shipment. On or about May 16, 2001, however, after 200 of the containers arrived in India, Plaintiffs learned that Golden Traders did not exist or lacked interest in the shipment. *Id.* ¶¶ 37–38. After notifying Aref of the problem, Plaintiffs allege that Arween, on behalf of Aref, provided Plaintiffs with a replacement consignee, Poonanam Ent. ("Poonanam"). *Id.* ¶ 39. Plaintiffs allege that on May 18, 2001, Poonanam informed them it was not interested in the tires, but that on May 21, 2001, Arween again told Plaintiffs that Poonanam would offer $1,000 per container for the tires. Plaintiffs allege that they accepted the offer from Poonanam, but that the offer did not exist and that Arween knew as much. *Id.* ¶¶ 40–42. On June 15, 2001, after Plaintiffs learned that Poonanam would not take any of the containers of tires, India Customs impounded the containers and Plaintiffs abandoned them. *Id.* ¶ 44.

As a result of this scheme, Aref is alleged to have collected a substantial sum from the various New York and New Jersey tire dealers for the purported disposal, while leaving Maersk holding the bag (or, more precisely, the tires). Maersk alleges damages arising from this scheme in the amount of $5.25M. *Id.* ¶ 51.

It is generally alleged that Mohinder acted in the Tire Fraud "directly and/or indirectly through Rednihom and Aref and/or authorized [Arween] and/or Mandeep to act on his behalf" in furtherance of the scheme. *Id.* ¶ 45. Maersk also alleges that Mohinder was a principal of the New York Defendants for the purposes of the bill of lading signed by Maersk and Aref to effectuate the Tire Shipment. Thus, according to Maersk, Arween, Mandeep, Aref and Mohinder are jointly and severally liable to Maersk for approximately $5.25M.

ii. Neewra Fraud

The second alleged scheme involved the shipment of goods from the United States to Kuwait. On or about March 5, 1999, Arween, on behalf of Neewra, contracted with Maersk to ship a container said by Neewra to contain "20 crates of electrical spare parts" for delivery to Kuwaiti consignee al Tamasok. Compl. ¶ 71. The bill of lading issued by Maersk used the same description for the cargo, as did the export declaration submitted to the U.S. government. *Id.*

The shipment arrived in Kuwait on April 10, 1999. *Id.* ¶ 74. According to the Complaint, al Tamasok—the Kuwaiti consignees—repeatedly attempted to convince Maersk to release the container without first being presented with the original bill of lading. *Id.* ¶¶ 72, 74, 78. Eventually, Arween, acting on behalf of Neewra, gave Maersk permission to release the container against al Tamasok's bank check as security for the original bill of lading. Arween presented al Tamasok with an in-

voice showing that container was worth less than $10,000. *Id.* ¶ 79. Maersk also confirmed with Kuwaiti customs that the value of the cargo in the container was approximately $10,000. *Id.* Based on this amount, Maersk informed al Tamasok that it would have to post security in an amount three times the value of the cargo to be released, namely $30,000.

After al Tamasok gave Maersk its bank check for $30,000, al Tamasok took delivery of the Electronics Shipment on May 5, 1999 without the original bill of lading. *Id.* ¶ 80. Five days later, on May 10, 1999, Neewra forwarded the original bill of lading to its bank in New York, Banco Popular, with instructions that it was not to release the bill of lading to al Tamasok until it had paid $1.86M for it.

Plaintiffs allege that, meanwhile, Joginder and/or Mohinder sent intermediaries to corrupt one of Maersk's employees in Kuwait, in order to obtain a blank bill of lading. *Id.* ¶ 81. Although it is Maersk's (as well as the rest of the shipping industry's) policy to never release blank bills of lading, the Kuwaiti Defendants were allegedly successful in obtaining one.

Joginder and/or Mohinder and their co-conspirators then allegedly persuaded a web-site designer to "doctor" the blank bill of lading in such a way as to make it appear to be the original bill of lading for the Neewra shipment. *Id.* ¶ 83–84. According to Plaintiffs, the fictitious bill of lading was then provided to Maersk in return for al Tamasok's original $30,000 security deposit.

After Maersk had delivered the container to al Tamasok, and had returned al Tamasok's security deposit, Neewra informed Maersk that it had never received payment from al Tamasok, and hence had not released the original bill of lading. Maersk then inspected the bill of lading it had received and realized that it was fraudulent. Maersk attempted to contact al Tamasok, but its phone went unanswered and its premises were abandoned. Neewra then informed Maersk that it would be held responsible for the loss of the container, and informed Maersk, for the first time, that the container held approximately $1.86M worth of Seagate brand hard drives.

Neewra then filed an insurance claim with its cargo under-writer, Continental Insurance Company ("Continental"). During the course of investigating this claim, Continental discovered that (1) Neewra's invoice for the hard drives, from a company called Micro–Spy, was fraudulent; (2) that Micro–Spy had never purchased that quantity of hard drives from Seagate; (3) that Seagate had never sold that quantity to Micro–Spy, Neewra, Arween, Aref or anyone else involved in the shipment; (4) that the container had been stuffed and sealed at an auto-parts company in a residential New Jersey neighborhood. Based on this evidence, as well as the various shipping and customs documents indicating that the shipment was of spare electrical parts worth less than $10,000, Continental concluded that Neewra's insurance claim was fraudulent, and refused to pay it.

Neewra then brought suit against Maersk in New York alleging misdelivery and conversion of the shipped goods. Compl. ¶ 100. Plaintiffs allege that Neewra brought the New York Lawsuit in an attempt to defraud them. In the suit, Neewra claimed that the shipping container it had stuffed, sealed, and delivered to Maersk's agent contained 2000 units of new computer hard drives, which Neewra had purchased from Seagate through Micro–Spy for $1.6M. Neewra alleged that it received an ocean bill of lading from Maersk's agent upon delivery of the container, and thereafter negotiated the bill of

lading to its bank. Neewra's bank was to hold the bill of lading—the document entitling al Tamasok to claim the cargo from Plaintiffs in Kuwait—until al Tamasok paid the full purchase price of $1.86M to Neewra. Neewra claimed that misdelivery and conversion occurred when al Tamasok obtained a fraudulent bill of lading and thereby obtained the cargo in Kuwait without paying the purchase price.

When Neewra's New York attorneys were confronted with the evidence of fraud adduced by Continental (Neewra's insurer), they withdrew the New York lawsuit. *Id.* ¶ 100. Not to be deterred, Neewra obtained New Jersey counsel and attempted to pursue the same claim there. Once again, when Neewra's New Jersey attorneys were presented with the evidence of fraud, the claims were withdrawn. *Id.* ¶ 101.

In 2004, Neewra brought an action against Maersk in Kuwaiti court, claiming misdelivery of the Electronics Shipment and seeking to recover $1.86M. *Id.* ¶ 103. At the time of the suit, however, Neewra no longer existed under New York law, and Plaintiffs allege that Neewra enlisted Help Line, Parkar and others to pursue its claim via an invalid power of attorney. In connection with the lawsuit, Neewra caused Plaintiffs' ship, the M/V Alva Maersk, to be arrested in Kuwait in April 2004. *Id.* ¶ 103. Plaintiffs posted cash security in the amount of $1.86M with the Kuwaiti court and obtained release of the ship. *Id.* ¶ 105.

Later that month, Paolo Ghirardani, Plaintiffs' London attorney tasked with investigating the possibility of fraud in connection with the Electronics Shipment, arranged a meeting in Kuwait with Neewra's "decision maker" ("April 2004 Meeting"). Ghirardani Decl. ¶¶ 119, 123. Plaintiffs allege that at the April 2004 Meeting, Mr. Ghirardani met an individual introduced as "Mr. Joginder." According to Plaintiffs, "Mr. Joginder" did not say much, and the meeting ended in less than 30 minutes, after an unfruitful discussion regarding settlement of the litigation pending in the Kuwaiti court. At the close of the meeting, "Mr. Joginder" handed Mr. Ghirardani his business card for Help Line.

In the litigation that followed, Neewra lost its claim in the Kuwaiti trial court but succeeded on appeal. Pursuant to the appellate court's decision, Plaintiffs' $1.86M bond was transferred to Neewra. Compl. ¶ 113.

Plaintiffs allege that the Neewra Fraud, and the litigation it spawned, has caused it $2.25M in damages. Again, the New York Defendant's role appears to be quite direct. The Kuwait Defendants are alleged to have participated by carrying out the procurement of the shipment by means of the false bill of lading; by pursuing Neewra's fraudulent claim in the Kuwaiti courts; and by thwarting the investigation into that claim by intimidating witnesses and harassing Maersk's employees. Thus, Maersk alleges that Neewra, Arween, Mohinder, Joginder, Parkar and al Tamasok are all jointly and severally liable to it for the amount of $2.25M.

### iii. Rednihom

The third scheme described in the Complaint began in a manner similar to the Neewra Electronics Shipment. Plaintiffs allege that on July 20, 1999, Arween or Mandeep, posing as Mohinder and acting through Rednihom Inc., contracted with Maersk regarding a shipment that it claimed contained 4,000 pieces of "PC Parts" ("PC Parts Shipment"). The PC Parts Shipment occurred four months after the Electronics Shipment. By the time the PC Parts Shipment was discharged in Kuwait on August 20, 1999, Plaintiffs were already aware of problems with the Neew-

ra Electronics Shipment. After noticing that the freight forwarder was identical for both shipments, and that Rednihom's address was the same as Neewra's (Ghirardani Decl. ¶ 76), Plaintiffs, along with the Kuwaiti Port Authority and Customs authorities, unsealed the container and found mostly used automotive parts. Plaintiffs allege that the cargo did not include any of the computer parts described in the bill of lading. Compl. ¶ 120.

The PC Parts Shipment was abandoned by the named consignees for nearly three months, and Plaintiffs later discovered that the consignees did not exist. *Id.* ¶ 121–22. Plaintiffs allege that Help Line, through Joginder and/or one of Help Line's employees, thereafter contacted Plaintiffs and requested (1) that they be permitted a survey of the container, and (2) that Plaintiffs send the container to a new consignee in Dubai. Plaintiffs allege that Defendants were attempting to find an alternative way to present a false claim against Maersk with regard to the PC Parts Shipment.

Maersk alleges that although this scheme was thwarted, it has still been damaged in the amount of $32,000, for which it claims Mohinder, Arween, Joginder, Mandeep, Help Line, Sabharwal and Rednihom are directly and jointly and severally liable.

#### iv. Other alleged bad behavior

Plaintiffs also allege that Defendants have engaged in other, similar schemes to defraud international shipping companies. Presumably, this allegation is made to bolster Plaintiffs' claims under the RICO statute, or to establish a conspiracy between all of the named defendants that will subject the Kuwaiti Defendants to jurisdiction here.

#### c. *Litigation History*

##### i. The verified complaint and garnishment of Mohinder's funds

The present litigation began when Maersk filed the Verified Complaint on May 3, 2005. Two days later, Judge Casey issued a Maritime Attachment and Garnishment for seizure of the assets of the named Defendants. The Verified Complaint alleges the three frauds—with damages reaching over $8M—as well as civil RICO on the basis of those frauds, for which treble damages in the amount of nearly $25M is sought.

In November of 2005, Wachovia garnished over $450,000 being transferred from Mohinder to Mandeep in Kuwait. On November 22, 2005, Mohinder received notification in writing from his Bank in India that Wachovia had restrained his wire transfer. On the same day, Plaintiffs received a phone call from an individual identifying himself as "Mohinder Singh Sahani." During the conversation and several subsequent ones, this individual protested Plaintiffs' interference with the transferred funds. Plaintiffs allege that this individual was not Mohinder, but rather his son, Mandeep. Mandeep told Plaintiffs that the likely target of the attachment order was another "Mohinder Singh Sahni who lives in Kuwait and has a questionable reputation." *See Maersk, Inc. v. Neewra, Inc.,* 443 F.Supp.2d 519, 526 (S.D.N.Y.2006). This other "Mohinder Singh Sahni" allegedly was a prominent tire dealer and had a brother named "Abul Sabah," which is another alleged alias of Defendant Arween. *Id.* During these calls, Mohinder consented to be deposed in Kuwait in connection with the attachment of his funds.

In December 2005, Mohinder submitted to a deposition in Kuwait without the benefit of counsel. Mr. Ghirardani—whom the reader may recognize as Maersk's London

counsel in charge of investigating Neewra's claim against Maersk in the Kuwaiti courts—attended the deposition, and recognized Mohinder as the same individual with whom he met at the April 2004 Meeting regarding the Neewra fraud. The individual at that meeting had identified himself as "Joginder," not "Mohinder." Plaintiffs' senior employee in Kuwait, Bimal Kanal, who had accompanied Mr. Ghirardani to the April 2004 Meeting, also later identified Mohinder as the same individual who attended that meeting. Mohinder has denied being present at the 2004 meeting, and his brother, Joginder, has submitted an affidavit stating that he, not Mohinder, was there. Joginder 2006 Decl.

During the 2005 deposition Mohinder claimed that he was not the "Mohinder Singh Sahni" named in the complaint. He claimed that, for one, he spelled his name "S–A–H–A–N–I," that is, with an extra "A." Mohinder claimed that he was no longer close to his brother Joginder or his nephew Arween, and that he had no knowledge of or involvement with any frauds.

Maersk's attorneys then presented him with a variety of documents in which he had spelled his name "S–A–H–N–I," and Mohinder was unable to explain the discrepancy. Mohinder also maintained that there was another Mohinder Singh Sahni who had been impersonating him and working with his family, and who was married to a woman named "Narinder," which also happened to be his wife's name. Other intriguing details of the 2005 deposition are in the record, and need not be recited here. *See* Ghirardani Decl. ¶¶ 143–58.

On January 13, 2006, Plaintiffs informed Mohinder that his funds would not be released. Mohinder then retained counsel, and on May 8, 2006, filed an order to show cause why Plaintiffs' attachment of his funds should not be vacated. Mohinder

contested the garnishment order on a number of theories. First, Mohinder argued that service was not properly made on Wachovia on the relevant date. Second, Mohinder made the same claim he had made in his deposition, arguing that he was not the Mohinder Singh Sahni referred to in the complaint. Finally, Mohinder argued that even if he was the Mohinder named in the complaint, the complaint failed to state a claim against him, let alone a maritime claim. *Maersk,* 443 F.Supp.2d at 528–32.

After an initial hearing on the motion, Judge Chin, as Part I Judge, ordered the parties to submit briefing only on the issues of service of process and the adequacy of Plaintiffs' prima facie allegations. Judge Chin vacated the attachment after the second hearing, concluding that Plaintiffs had not served a valid Process of Attachment on Wachovia. After being asked to reconsider, Judge Chin reinstated the attachment, and referred the matter to Judge Casey.

ii. Judge Casey's August 1, 2006 decision

In an opinion dated August 1, 2006, Judge Casey rejected Mohinder's theory that service had not been properly made on Wachovia. *See Maersk,* 443 F.Supp.2d at 519. What is relevant here, however, is Judge Casey's findings regarding Mohinder's other theory, namely that he is not the Mohinder Singh Sahni named in the Verified Complaint, and that even if he were, the complaint failed to state a claim against him.

Judge Casey noted that Mohinder's theory that he could not be the named "Mohinder" because he spelled his name S–A–H–A–N–I rather than S–A–H–N–I was plainly contradicted by a host of documents in which Mohinder *did* spell his name S–A–H–N–I, including his applica-

tion for war fund reparations from the Kuwaiti government. *Id.* at 529–30. Judge Casey went on to note that, "[Mohinder] has provided no explanation for these discrepancies, which do more than merely discredit his assertion that he is not named in the Complaint; his dissembling has colored the Court's overall perception of his credibility." *Id.* at 530.

Judge Casey went on to name various other behaviors that had seriously impaired Mohinder's credibility:

> Movant Sahani has made largely unsubstantiated assertions that his brother and nephew cooperated with a different "Mohinder Singh Sahni," a Kuwaiti businessman of ill-repute who deals in tires; he allowed his son, Mandeep, to speak not only for him but as him during several telephone conversations with Plaintiffs; and he dubiously obtained a last minute affidavit from his brother, Joginder, after having requested a protective order from the Court for fear that Joginder would commit violence against him in connection with the instant litigation.

*Id.* On the basis of this highly suspicious behavior, Judge Casey found "reasonable grounds" to believe that Mohinder was "intricately involved in the events alleged in the Complaint ..." *Id.* As a result, Judge Casey refused to release Mohinder's funds from the maritime attachment on the basis of his not being the Mohinder named in the complaint.

As to Mohinder's argument that the Original Verified Complaint failed to state a cause of action against him, Judge Casey concluded that reasonable grounds existed to find that Mohinder was a principal of Neewra and Rednihom at the time of the alleged frauds. *Id.* at 531 ("Together with the Complaint, Plaintiffs extrinsic allegations and evidence provide reasonable grounds to believe that [Mohinder] was a

principal of Neewra, Rednihom, and [Aref]."). Thus, Judge Casey concluded that clause 14(4) of the bill of lading between Neewra and Maersk could apply to Mohinder as a principal of Neewra.

Mohinder's motion for reconsideration and certification for appeal were denied on October 6, 2006. *Maersk, Inc. v. Neewra, Inc.,* 2006 WL 2854298, at *1 (S.D.N.Y. Oct.6, 2006) (RCC).

### iii. The amended verified complaint

After the August 1, 2006 decision, Plaintiffs revised their theory regarding Mohinder's role in the frauds, and filed the Amended Verified Complaint on August 31, 2006. Rather than asserting that Mohinder himself carried out actions on behalf of Neewra and Rednihom in New York, Plaintiffs now allege that he instructed or authorized his son Mandeep and/or his nephew Arween to carry out those actions using his identity.

The theory as to the other Kuwaiti Defendants is that they participated in, or directed, the conspiracy to defraud Plaintiffs. This includes not only authorizing the New York Defendants to act, or instructing the New York Defendants, but also fraudulently obtaining the Neewra shipment in Kuwait by defrauding various employees of Maersk and al Tamasok, as well as the website designer; defrauding the Kuwaiti court in the pursuit of Neewra's fraudulent claim for the $1.86M connected with the Neewra shipment; attempting to obtain the release or diversion of the Rednihom shipment in pursuit of another fraudulent claim against Maersk; intimidating potential witnesses against the Singh Sahni family; and attempting to throw Maersk off their scent by impersonating one another both on the phone and in person.

Specifically, Counts I and II are based on the Tire Fraud. Count I alleges breach of contract—the Maersk bill of lading for the Tire Shipment—against Arween, Mandeep, Aref and Mohinder, as their principal. Count II alleges a "fraudulent scheme" arising from the Tire Shipment, and seeks to hold the same four Defendants liable.

Counts III and IV are based on the Neewra Fraud. Count III alleges fraud against Neewra, Arween, Mohinder, Joginder, Sabharwal, Parker and al Tamasok. Count IV alleges breach of contract—the Maersk bill of lading for the Neewra Electronics Shipment—against Neewra, Arween, Sabharwal, al Tamasok, Joginder, Sardar and Sardar Int'l.

Count V alleges fraud, on the basis of the Rednihom shipment, against Mohinder, Arween, Joginder, Mandeep, Help Line, Sabharwal and Rednihom.

Count VI alleges civil RICO against all of the named defendants.

Count VII alleges a common law conspiracy to commit fraud claim, on the basis of Counts I–V, against Arween, Mohinder, Joginder, Mandeep, Neewra, Rednihom, Aref, Help Line, al Tamasok, Sardar and Sardar Int'l.

Maersk alleges damages arising from the three principal frauds described above (Tire Fraud, Neewra Fraud and Rednihom Fraud) in the amount of approximately $8.33M. Based on its civil RICO claim, Maersk seeks treble damages in the amount of approximately $25M.

The New York Defendants—Arween, Mandeep, Neewra, Rednihom and Aref—have not appeared in response to either the Original Verified or the Amended Verified Complaint. On May 26, 2006, default judgment was entered against Neewra, Rednihom, and Aref. A damages inquest as to those Defendants is pending before Magistrate Judge Eaton. Plaintiffs received permission to serve Arween and Mandeep by publication on August 25, 2006, and have apparently done so. However, from all that appears, no default judgment has been entered against these Defendants.

iv. The motions to dismiss

On March 30, 2007, the moving defendants here submitted their various motions to dismiss. First, Mohinder moves to dismiss the complaint against him, arguing that the court lacks personal jurisdiction over him; that the Plaintiffs have failed to plead fraud with particularity against him, defeating both the fraud claims and the RICO claim for which those frauds serve as predicates; and that in any event, the action should be dismissed as to him under the doctrine of *forum non conveniens*.

The rest of the moving defendants (Joginder, Parkar, Help Line, Sardar and Sardar Int'l) move for dismissal on the ground that the court lacks personal jurisdiction over them, and argue that the complaint should be dismissed as to them under the doctrine of *forum non conveniens*.[1]

I address the issues as follows: personal jurisdiction as to all defendants (III.a.), *forum non conveniens* as to all defendants (III.b.), and Mohinder's remaining arguments (III.c.).

III. Discussion

a. Personal Jurisdiction

i. Over Mohinder

Mohinder's first argument is that this court lacks personal jurisdiction over him,

---

1. To account for all of the Defendants, the court groups them as follows: (1) Defaulting Defendants, Neewra, Rednihom, Aref, Arween and Mandeep; (2) Moving Defendants, Mohinder, Joginder, Parkar, Help Line, Sardar, and Sardar Int'l; and (3) Missing Defendants, al Tamasok and Sabharwal.

so that the complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(2).

### 1. Standard of review on 12(b)(2) motion

The plaintiff "bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss." *Whitaker v. American Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir.2001) (internal citations omitted). Where the court holds an evidentiary hearing to resolve factual disputes, the plaintiff must establish jurisdiction by a preponderance of the evidence. I refer to this standard as the post-discovery 12(b)(2) standard below.

■■■ However, where a court rules on a 12(b)(2) motion based on pleadings and affidavits, the plaintiff is only required to make a prima facie showing of jurisdiction over the defendant. *DiStefano v. Carozzi N. Am., Inc.,* 286 F.3d 81, 84 (2d Cir.2001); *Whitaker,* 261 F.3d at 208. While personal jurisdiction "must be established either at an evidentiary hearing or at trial," allegations submitted solely through competing affidavits are "construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiffs favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir.1993). I refer to this standard as the pre-discovery 12(b)(2) standard below.

Maersk has had an opportunity to depose Mohinder (though not the other Kuwaiti Defendants), and submits voluminous exhibits in support of its personal jurisdiction argument over him. Thus, the post-discovery standard applies.

I find that Plaintiffs have satisfied their burden, and so deny Mohinder's motion to dismiss for lack of personal jurisdiction.

### 2. Maersk's Theories of Jurisdiction

Maersk presents two theories under which Mohinder may be subject to this court's jurisdiction.

The first is the shipping contract between Maersk, Inc. and Neewra, embodied in Maersk's standard bill of lading. Clause 14(4) of that bill of lading reads as follows:

> The Shipper, consignee, holder hereof, and owner of the goods, *and their principals,* shall be jointly and severally liable to Carrier for the payment of all freight, demurrage, Geberal Average and other charges due hereunder, without discount, together with any Court costs, expenses and reasonable attorney fees incurred in collecting any sums due Carrier.

(emphasis added). Maersk's standard bill of lading also contains a forum selection and choice of law clause, designating this court as the exclusive forum for litigating certain disputes under the contracts.

> [T]his contract is to be governed by United States law and United States Federal Court of the Southern District of New York is to have exclusive jurisdiction to hear all disputes hereunder, including any disputes relating to freight or other sums payable to the Carrier for carriage to or from the USA.

*See* Pl.'s Opp. (Multiple Defendants) at 12. Maersk argues that, in light of his relationship with the New York Defendants, Mohinder is a "Merchant" under that contract, and hence subject to the forum-selection clause contained therein. Alternatively, Maersk argues that Mohinder is a "principal" of Neewra within the meaning of clause 14(4) of the shipping contract, and hence is liable for Neewra's defaults, and subject to the forum selection clause. Pl.'s Opp. (Mohinder) at 1–8.

Maersk's second theory is that the New York Defendants (Neewra, Rednihom, Aref, Arween and Mandeep) were either Mohinder's agents or his co-conspirators. As a result, Mohinder would be subject to New York's long-arm statute, N.Y. C.P.L.R. § 302 ("Section 302"). Section 302(a)(1) states that "a court may exercise personal jurisdiction over any non-domiciliary ... who in person *or through an agent* ... transacts any business within the state or contracts anywhere to supply goods or services in the state." (emphasis added). Under Section 302(a)(1), a defendant "who transacts business in New York will be subject to personal jurisdiction in New York if the acts were purposeful and there is a substantial relationship between those acts and the plaintiff's claim." *Semi Conductor Materials, Inc. v. Citibank Int'l PLC,* 969 F.Supp. 243, 246 (S.D.N.Y.1997) (citing *PDK Labs. Inc. v. Friedlander,* 103 F.3d 1105, 1109 (2d Cir.1997)).

In reality, Maersk's various jurisdictional theories all amount to the same thing: namely that the New York Defendants committed their various delicts either "on behalf of" or "with instructions from" or "for the benefit of" Mohinder. If this proposition is true, then personal jurisdiction attaches under any of Maersk's theories. Mohinder would be a principal of Neewra under the shipping contract (and perhaps a merchant, though this is less clear), subjecting him to the forum-selection clause; he would be "transact[ing] ... business within the state ... through an agent" for the purposes of 302(a)(1); and he would be a co-conspirator, subjecting him to jurisdiction pursuant to Section 302. *See* N.Y. C.P.L.R. § 302, Practice Commentaries C302:4, Commission of Acts "Through an Agent." ("The New York activities of a co-conspirator may also be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale.").

On the other hand, if—as Mohinder contends—the New York Defendants did not act at the direction of, for the benefit for, or on behalf of Mohinder, then all of Maersk's theories fail. He could not be "Merchant" or "principal" under the contract, and he could not be a principal or co-conspirator under the statute.

Nonetheless, there are important some differences between the theories. For instance, if Mohinder is found to be a principal under the terms of the bill of lading contract, then he is considered to have consented to jurisdiction here on the basis of the forum selection clause. *D.H. Blair & Co., Inc. v. Gottdiener.,* 462 F.3d 95, 103 (2d Cir.2006) ("Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.") (citing *Nat'l Equip. Rental, Ltd. v. Szukhent.,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964)). In that case, there would be no need to engage in the Due Process analysis that is necessary if Mohinder is only subject to jurisdiction under New York's long-arm statute.

 Second, the issue of whether Mohinder is bound by the contract is not just relevant to jurisdiction; it is the ultimate issue in the case. A ruling on a motion to dismiss for lack of personal jurisdiction cannot and must not purport to determine the ultimate issue of liability for breach of contract. The same is true for a finding that Mohinder was or was not a principal for the purposes of Section 302: that issue is determinative of jurisdiction, and an element of Mohinder's liability for the various alleged frauds and conspiracies.

Third, Mohinder's alleged liability on the contract is the basis for this court's maritime jurisdiction, and hence the basis for the validity of the maritime attachment of Mohinder's ETF.

Finally, if Mohinder is bound by the contract and its forum selection clause, then his *forum non conveniens argument has no merit.*

As discussed further below, Judge Casey has already found that Mohinder is bound by Clause 14(4) of the shipping contracts, though under a "reasonable grounds" standard of review inapplicable here. However, the outcome does not change under either the pre- or post-discovery 12(b)(2) standard, so that for jurisdictional purposes, Mohinder is bound by 14(4), and hence is considered to have consented to jurisdiction. It should once again be emphasized that this finding is not determinative of any substantive liability. While Plaintiffs have surmounted their 12(b)(2) burden, after further discovery Mohinder can renew his 12(b)(2) motion, or move for summary judgment on the contract claims, or argue to a jury that the factual basis for finding him a principal under the contract does not exist. The same is true with respect to a finding that Mohinder is an agent or co-conspirator under the long-arm statute; although this overlaps with Mohinder's substantive liability, it does not determine it. Mohinder is free renew his arguments against these elements of his liability on a different motion or before a jury.

Nonetheless, in the interest of thoroughness, I analyze jurisdiction over Mohinder both under the shipping contracts and under Section 302, Due Process analysis and all. To the extent that Mohinder's liability under the contract becomes relevant to other arguments raised in Mohinder's motion, it will be discussed when those arguments are being addressed.

### 3. Post-discovery standard

I begin with the question of whether Mohinder is subject to jurisdiction under Section 302(a)(1) as a principal of the New York Defendants, as this determination is sufficient—though not necessary—to establish that he is subject to jurisdiction as a principal under the contract.

■ In determining whether an agency relationship exists for the purposes of Section 302, courts "have focused on the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir.1986) (internal citations omitted). Specifically, the alleged agent "must have acted in the state for the benefit of, and with the knowledge and consent of, the non-resident principal." *Id.* (internal quotations omitted). While the principal need not exercise absolute control over the decisions or acts of the putative agent, *see id.,* a sufficient amount of control "may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles." *Scholastic, Inc. v. Stouffer,* 2000 WL 1154252, at *5 (S.D.N.Y. Aug.14, 2000); *see also CutCo,* 806 F.2d at 366 (sufficient control where agent and principal engaged in joint venture or joint partnership).

■ As noted, the issue of whether a foreign defendant is engaged in a conspiracy within the jurisdiction of the court is similar. N.Y. C.P.L.R. § 302, Practice Commentaries C302:4, Commission of Acts "Through an Agent." ("The New York activities of a co-conspirator may also be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale."). Judge Casey described the reach of the co-conspirator theory under New York law as follows:

> To warrant the inference that a defendant was a member of the conspiracy [for jurisdictional purposes], Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-

conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant."

*In re Terrorist Attacks of September 11, 2001,* 349 F.Supp.2d 765, 805 (S.D.N.Y. 2005) (quoting *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1268–69 (S.D.N.Y.1991)) (other citations, quotations and subsequent history omitted).

█ Maersk alleges that Mohinder authorized his son Mandeep and his nephew Arween to use his identity to establish Neewra and Rednihom in the United States, Compl. ¶ 12; that in so authorizing, Mohinder was aware of the frauds those companies would be used to commit, *id.;* that Arween was acting as Mohinder's agent when he entered the contract with Maersk for the Tire Shipment, *id.* ¶ 31; and that Mohinder participated as a principal in the Rednihom Fraud, *id.* ¶¶ 119–24.

Plaintiffs faced an uphill battle in convincing me that Mohinder is part of an international shipping fraud syndicate, that runs a shadow operation across the globe, employs numerous shifting identities and dummy corporations, and that assaults potential witnesses, bribes and defrauds government officials, and routinely ransacks hotel rooms. The extraordinary nature of these allegations gives me pause, but does not lead me to find that no reasonable jury could believe them. Indeed, Paolo Ghirardani, whose declaration contains many of the more colorful allegations, is a well-respected investigator of shipping fraud and this court has no reason to doubt the veracity of his account. Mohinder, on the other hand, has not conducted himself in a trustworthy manner.

Especially damning is the manner in which Mohinder conducted himself during the maritime attachment proceeding, i.e., claiming that he was not the same Mohinder Singh Sahni named in the original Complaint. While Plaintiffs' original theory as to Mohinder did prove flawed, this had nothing to do with Mohinder's own theory, which was that he'd been mistaken for an altogether different Mohinder Singh Sahni, who spelled his name differently (sometimes) and had a bad reputation in Kuwait. By all accounts, Mohinder's claims in this respect were patent lies, and were found to be so by Judge Casey. *See Maersk, Inc. v. Neewra, Inc.,* 443 F.Supp.2d 519, 529–30 (S.D.N.Y.2006). Mohinder has now dropped this claim, but cannot explain why it should not destroy his credibility. Adopting a false identity in an attempt to bamboozle a government official makes Ghirardani's allegations significantly more plausible.

Indeed, Mohinder's behavior led Judge Casey to conclude that "Together with the complaint, Plaintiffs' extrinsic allegations and evidence provide reasonable grounds to believe that [Mohinder] was a principal of Neewra, Rednihom and [Aref]." *Id.* at 531. Although this precise issue was not before Judge Casey, as he was not faced with a motion to dismiss, nothing in the submissions since his August 1, 2006 ruling leads me to believe that Maersk has not also established by a preponderance the existence of a principal-agent relationship.

Although Maersk has little direct evidence linking Mohinder to the frauds, it presents sufficient circumstantial and inferential evidence to sustain such a connection. As noted, Mohinder allowed Mandeep to impersonate him during phone calls with Maersk's representatives. Mohinder attempted to fool Judge Casey as to his identity. Maersk also alleges that Mohinder posed as Joginder at the April 2004 Meeting. Taken together, and in light of Mohinder's non-existent credibility, this

gives rise to a fair inference that Mohinder is involved in "an international web of suspect corporations and individual actors who employ tacit alliances and shifting identities as the primary tools of their malfeasance." *Id.* at 530–31. It is at least sufficient to convince me that it is more likely than not that Mohinder was a principal or co-conspirator of the New York Defendants during the alleged frauds. Plaintiffs have therefore met their burden of showing personal jurisdiction over Mohinder.[2]

### 4. Due Process

My determination that Maersk has shown that Mohinder was a principal of the New York Defendants under the post-discovery 12(b) (2) standard is sufficient to establish personal jurisdiction over Mohinder on the basis of the contract, which binds principals.

█ But there is more. This determination also establishes the applicability of New York's long-arm statute to Mohinder. *See* N.Y. C.P.L.R. § 302(a)(1) ("A court may exercise personal jurisdiction over any non-domiciliary ... who in person *or through an agent* ... transacts any business within the state or contracts anywhere to supply goods or services in the state.") (emphasis added). However, to establish long-arm jurisdiction, the court must also consider whether the exercise of personal jurisdiction over Mohinder based on Section 302 comports with constitutional guarantees of Due Process. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 124 (2d Cir.2002) ("If there is a statutory basis for jurisdic-

tion, the court must then determine whether New York's extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment."). To do so, the court must analyze whether the defendant "has 'certain minimum contacts [with the forum] ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.,* 241 F.3d 135, 152 (2d Cir.2001) (quoting *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)) (alteration in original; some internal quotation marks omitted). Where "the claim arises out of, or relates to, the defendant's contacts with the forum"—i.e., specific jurisdiction—minimum contacts exist "where the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court' there." *Id.; accord Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). A state may assert "general jurisdiction"—i.e., jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts—only where these contacts are "continuous and systematic." *U.S. Titan,* 241 F.3d at 152; *see also Helicopteros Nacionales de Colom., S.A. v. Hall,* 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

Mohinder's motion and declaration make much of the fact that he does not reside, own bank accounts, or otherwise spend time in New York. However, these arguments speak only to the assertion of *general* jurisdiction. Maersk's theory, on the other hand, is that the activities of Arween

---

**2.** Given the fruits yielded by the limited discovery attending the attachment proceeding, I believe full discovery against Mohinder in relation to these claims has a strong likelihood of defining more precisely his relationship to the three frauds, which aside from being ju-

risdictionally relevant, will also be relevant to Mohinder's substantive liability (or lack thereof). And of course, Mohinder is free to move for summary judgment on this issue, or argue to a jury that Plaintiffs have failed to establish that he was a principal to these schemes.

and Mandeep, through Aref, Neewra and Rednihom, should be imputed to Mohinder for jurisdictional purposes under either an agency or conspiracy rationale. Maersk sufficiently alleges facts supporting an exercise of transactional jurisdiction.

It is clear that the contacts that are the basis of the cause of action, for instance the contracts and misrepresentations made in New York by Mohinder's agents, are also the contacts giving rise to jurisdiction. These contacts also show Mohinder, through his agents in New York, purposefully availing himself of New York's laws. For instance, the sham corporations allegedly established in furtherance of this conspiracy, which permitted Defendants to present a legitimate face to Maersk, were incorporated in New York. New York law likewise governed the contracts entered into in furtherance of the conspiracy. The execution and presumed enforceability of these contracts were necessary to inducing Maersk to be defrauded. Thus, the necessary minimum contacts exist here.

■ The second part of the jurisdictional analysis asks, "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.1996) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Courts are to consider five factors in evaluating reasonableness: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the

most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life*, 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), and *Burger King*, 471 U.S. at 476–77, 105 S.Ct. 2174). Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life*, 84 F.3d at 568 (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174). The importance of the "reasonableness" inquiry varies inversely with the strength of the "minimum contacts" showing—a strong (or weak) showing by the plaintiff on "minimum contacts" reduces (or increases) the weight given to "reasonableness." *Id.* at 568–69 (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174).

On the assumption that Mohinder was a principal of the New York Defendants,[3] the exercise of jurisdiction here is manifestly reasonable. Any burden on Mohinder to litigate here is far out-weighed by New York's interest in discovering and imposing liability for these frauds, which employed New York corporations and contracts to defraud a New York Plaintiff. Plaintiffs' also have a weighty interest in obtaining relief for the nearly $8M it claims it lost as a result of the frauds. The interests of other states and the interstate judicial system are not particularly relevant, though one may imagine that they would have an interest in exposing and punishing an international scheme that might affect their ports as well.

---

**3.** Of course, on the assumption that Mohinder is not a principal, we would not have made it this far in the inquiry at all, since Section 302 would not apply to Mohinder in the first place.

In conclusion, I have determined that Maersk has shown that it is more likely than not that Mohinder is a principal within the meaning of the shipping contracts, and thus satisfied the post-discovery standard for surviving a 12(b)(2) motion to dismiss. As a result he is bound by the forum selection clauses in those contracts, and has therefore consented to jurisdiction here.

I have also concluded, in the alternative, that Maersk has shown that it is more likely than not that Mohinder is an agent or co-conspirator under N.Y. C.P.L.R. § 302(a)(1), thus satisfying the post-discovery 12(b)(2) standard for surviving a motion to dismiss. Because the New York long-arm statute applies, and exercising jurisdiction comports with Due Process, Mohinder is subject to the jurisdiction of this court independently of the Maersk shipping contracts.

#### ii. Over the other Defendants

As with Mohinder, Maersk asserts two theories under which these Defendants may be subject to this court's jurisdiction: under the shipping contracts, and as principals or co-conspirators for the purposes of N.Y. C.P.L.R. § 302. As will be seen, the availability of these theories varies from one Defendant to the next.

Unlike Mohinder, however, these Defendants have not been deposed or subjected to anything resembling jurisdiction-related discovery. Thus, on this motion Plaintiffs bear the pre-discovery 12(b)(2) burden of alleging facts sufficient to establish jurisdiction over each of these moving Defendants. *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998) ("Our cases show that '[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed.R.Civ.P. 11, legally sufficient allegations of jurisdiction,' i.e., by making

a 'prima facie showing' of jurisdiction.") (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990)) (other citations omitted). Because the allegations as to each moving Defendant differ in important respects, each Defendant is addressed separately below.

#### 1. Joginder

Plaintiffs attempt to establish jurisdiction over Joginder as either a principal or co-conspirator of the New York Defendants for the purpose of New York's long-arm statute, N.Y. C.P.L.R. § 302.

In determining whether an agency relationship exists for the purposes of Section 302, courts "have focused on the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir.1986) (internal citations omitted). Specifically, the alleged agent "must have acted in the state for the benefit of, and with the knowledge and consent of, the non-resident principal." *Id.* (internal quotations omitted). While the principal need not exercise absolute control over the decisions or acts of the putative agent, *see id.,* a sufficient amount of control "may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles." *Scholastic, Inc. v. Stouffer,* 2000 WL 1154252, at *5 (S.D.N.Y. Aug.14, 2000); *see also CutCo,* 806 F.2d at 366 (sufficient control where agent and principal engaged in joint venture or joint partnership).

As noted, the issue of whether a foreign defendant is engaged in a conspiracy within the jurisdiction of the court is similar. Section 302. N.Y. C.P.L.R. § 302, Practice Commentaries C302:4, Commission of Acts "Through an Agent." ("The New York activities of a co-conspirator may also

be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale"). Judge Casey described the reach of the co-conspirator theory under New York law as follows:

> To warrant the inference that a defendant was a member of the conspiracy [for jurisdictional purposes], Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant."

*In re Terrorist Attacks of September 11, 2001,* 349 F.Supp.2d 765, 805 (S.D.N.Y. 2005) (quoting *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1268–69 (S.D.N.Y.1991)) (other citations, quotations and subsequent history omitted).

Many of the allegations in the complaint that attempt to establish that Joginder is a principal or co-conspirator of the New York Defendants resemble, in their general and conclusory nature, the allegations made against Mohinder. For example, Maersk alleges that the Neewra shipment to Kuwait was "for the benefit of" Joginder and that Joginder pursued fraudulent litigation in connection with that shipment. It is also generally alleged that Joginder conspired together with the other Defendants in order to defraud Maersk.

However, Maersk does make additional, more concrete, allegations as to Joginder. These include the allegation that Joginder took numerous steps to obtain and doctor the fraudulent bill of lading for the Neewra Shipment, including an attempt to bribe one Elvis Pinto. Maersk also alleges that Joginder acted a principal of Parkar's

while the latter pursued the diversion of the Rednihom shipment to Dubai.

■ Most significantly, Joginder submitted an affidavit in connection with Mohinder's earlier motion to vacate the attachment of his funds, in which Joginder claimed to have been present at the 2004 meeting with Ghirardani. Maersk alleges that this was not Joginder, but rather Mohinder; in either event, Maersk alleges that whoever it was, he was held out as a decision-maker for either Neewra or the Singh Sahni family as a whole. What this means is that either Joginder attended the meeting—in which case his connection with the Neewra fraud appears manifest—or his did not attend the meeting, in which case he lied under oath when he submitted his affidavit in Mohinder's earlier motion, in order to trick the court as to his identity, and to shield Mohinder from liability. Either circumstance supports a prima facie case of Joginder's involvement, either as a principal or a co-conspirator, in the frauds complained of by Maersk.

Under the pre-discovery standard, Maersk needs only present a prima facie case for jurisdiction over Joginder. Although Joginder contests Maersk's allegations, I must credit the Plaintiffs' allegations, unless that are incredible, or amount to nothing more than "bland assertion[s] of conspiracy or agency." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 793 (2d Cir.1999). I find that Plaintiffs have alleged facts, which, if believed, establish with sufficient detail Joginder's role as a principal in this conspiracy, and the specific acts by which Joginder carried the conspiracy forward. Under the pre-discovery standard I must credit these allegations, which amount to more than "bland assertions."

The prima facie existence of a principal-agent relationship suffices to establish that Joginder is bound by the shipping con-

tracts, including the forum selection clause, 14(4). This amounts to Joginder's consent to jurisdiction. In order to establish New York's long arm statute—which prima facie applies to Joginder—as an independent basis, I must also consider whether the exercise of jurisdiction over Joginder comports with Due Process under controlling law.

The only way my Due Process analysis might differ between Mohinder and Joginder is that the assumption that Mohinder was a principal of the New York Defendants has been shown to be more likely than not, while I have only made a prima facie determination that a relationship exists between Joginder and the New York defendants. However, this is a distinction without a difference. Plaintiffs bear only a prima facie burden with respect to Joginder. Having met that burden, I assume Joginder's role in the frauds is as Maersk alleges for the purposes of my Due Process analysis. As a result, it does not differ significantly from my analysis with respect to Mohinder. *See* supra III.a.5.

Because I have no reservations about crediting Plaintiffs' conflicting allegations in this situation, I see no need for further discovery relating to Joginder on this issue. *See In re Alstom SA,* 406 F.Supp.2d 346, 397–98 (S.D.N.Y.2005) ("[T]he court need only determine whether the facts alleged by the plaintiff, if true, are sufficient to establish jurisdiction; no evidentiary hearing or factual determination is necessary for that purpose.") (citing *Credit Lyonnais Secs. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir.1999)). As with Mohinder, discovery conducted toward the end of litigating the substantive issues should reveal more precisely Joginder's role (or lack of one) in the frauds. At that point Joginder is free to renew his 12(b)(2) motion, move for summary judgment, or finally argue to a jury that there is no

factual basis for holding him liable for the New York Defendants' frauds.

2. Parkar

Maersk's allegations against Parkar are quite definite, and in some cases are admitted by Parkar. It is alleged that Parkar, as an employee of Help Line or of Joginder and/or Mohinder directly, pursued Neewra's fraudulent misdelivery claim against Maersk in the Kuwaiti courts. Also in connection with the Neewra litigation in Kuwait, it is alleged that Maersk's $1.86M cash deposit—submitted to the Kuwaiti court to secure the release of the M/V Alva Maersk—was made payable to Parkar. Zakaria Decl. ¶ 12. Maersk also alleges that Parkar attempted to have the fraudulently labeled Rednihom shipment diverted to Dubai, in order to pursue another fraudulent claim against Maersk there. Pl.'s Opp. (Multiple Defendants) at 10.

It is immediately clear that these allegations do not support the theory that Parkar was a *principal* of the New York Defendants—if anything, Parkar appears to be an agent himself, either of the New York Defendants, or of Mohinder and Joginder directly. Therefore, a prima facie case for jurisdiction over Parkar cannot be grounded on theory that Parkar was a principal of the New York Defendants under the contract or under Section 302.

██ Rather, the question is whether Maersk's allegations, if credited, state a prima facie case that Parkar was a co-conspirator of the New York Defendants in the commission of these frauds. *See In re Sept. 11,* 349 F.Supp.2d at 805 ("To warrant the inference that a defendant was a member of the conspiracy [for jurisdictional purposes], Plaintiffs must show that (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New

York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant.").

I conclude that Maersk has alleged the necessary elements. If its allegations are credited, then Parkar knew that his pursuit of the Neewra litigation in Kuwait would result in Neewra's fraudulently obtaining $1.86M; and, Arween and Mandeep's activities in New York (establishing dummy corporations, fraudulently entering into shipping contracts with Maersk) would be to the benefit of the Kuwaiti Defendants, including Parkar, who would be on the receiving end.

Naturally, Parkar claims that he did not know about, let alone act in furtherance of, any of the alleged schemes. I am faced then with a situation of conflicting affidavits on the crucial issue. Under the pre-discovery 12(b)(2) standard, I must credit Maersk's contentions, unless they are incredible, or nothing more than "bland assertions."

I do not find Maersk's allegation that Parkar knew he was helping to pursue a fraudulent claim incredible, or that it is no more than a conclusory assertion. It would be difficult for Parkar to pursue the Neewra claim without being aware of its factual basis, and, being aware of its factual basis, I imagine it would be hard *not* to know it was a fraud. Similarly, Parkar is alleged to have assisted Rednihom in its attempts to divert the Rednihom shipment, which had already been discovered to be fraudulently sealed and labeled in variance with its purported contents. Pl.'s Opp. (Multiple Defendants) at 10. If this latter allegation is credited, and taken together with Parkar's role in the Neewra fraud, there would seem to be ample grounds to find that he was a co-conspirator with the New York Defendants.

Because jurisdiction over Parkar is premised exclusively on Section 302, I must also consider whether the exercise of jurisdiction over him comports with Due Process standards. For many of the same reasons discussed above, I conclude that it does. The minimum contacts are established through imputation to Parkar of the New York Defendants' activities in furtherance of the frauds. *See* supra III.a.i.5. The "reasonableness" requirement is also met on the basis of this imputation, as well as Parkar's involvement in an international conspiracy that New York has a strong interest in unearthing and subjecting to liability.

3. Help Line

Maersk's allegations against Help Line are quite similar to its allegations against Parkar. For example, the complaint alleges that Help Line employed Parkar, and pursued Neewra's fraudulent claims against Maersk in Kuwait. Help Line is also alleged to have assisted Rednihom in its attempts to have its fraudulently labeled shipping container diverted to Dubai, where Maersk alleges Defendants planned to bring another fraudulent claim. It is also claimed generally that Help Line is either owned or effectively run by Joginder or Mohinder, and that Help Line business cards have been handed out by various individuals purporting to represent Neewra's and Rednihom's interests in Kuwait, including Joginder himself. Pl's Opp. (Multiple Defendants) at 11.

Thus, as with Parkar, I construe Maersk's theory of jurisdiction not to be that Help Line was a principal of the New York Defendants, but that it was their co-conspirator in their frauds. If Maersk can establish a prima facie case that Help Line was a knowing participant in its various frauds, then Help Line is subject to New

York's long-arm jurisdiction under Section 302.

For the reasons discussed with respect to Parkar, Maersk's allegation that Help Line knowingly assisted Neewra and Rednihom pursue their fraudulent claims in Kuwait states a prima facie of a co-conspirator relationship among Help Line and the New York Defendants. Help Line disputes Maersk's allegations, but because Maersk's allegations are not unbelievable I must credit them. Thus, for the reasons stated with respect to Parkar, Section 302 applies to Help Line, and the exercise of the jurisdiction comports with Due Process standards. *See* supra, III.a.ii.2.

### 4. Sardar and Sardar Int'l

Finally, with respect to the Sardar companies, I agree with Defendants that Maersk has failed to make even a liberal pre-discovery showing of personal jurisdiction. Plaintiffs allege that these companies are owned or operated by Joginder or Mohinder, but Plaintiffs do not allege that they have been employed in any way in the course of the frauds, beyond the "bland assertion" that "The Sardar companies were used as legitimate fronts in Kuwait when it suited the purposes of the group." Pl.'s Opp. (Multiple Defendants) at 12. In contrast with the more specific allegations leveled against the other Kuwaiti Defendants, the allegations against the Sardar companies are just the kind of conclusory allegations of conspiracy that cannot sustain even a prima facie case of jurisdiction over a foreign defendant. *See generally Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 793 (2d Cir.1999).

While—given the nature of the frauds complained of—I am sympathetic with Plaintiffs' scatter-shot approach to naming defendants, the dearth of specific allegations tying the Sardar companies to the

alleged frauds leads me to conclude that the net has been cast too wide in this instance. Accordingly, they are dismissed from this action.

### b. Forum non conveniens

I am addressing my discussion of *forum non conveniens* to all of the moving defendants, because both motions present the issue, and, if anything, their arguments are stronger combined.

It should also be noted that the *forum non conveniens* argument falls flat on its face as to Mohinder and Joginder, in light of my finding that both of them are principals under the shipping contracts, and thus to have consented to this forum as the sole location to litigate disputes. *See* supra parts III.a.i. and III.a.ii.1.

However, even in the absence of that determination, which I made only for purposes of personal jurisdiction—and which in any event was not necessary for jurisdiction—Defendants' *forum non conveniens* arguments do not persuade me that Kuwait would be a more convenient forum in which to litigate this dispute.

The argument is made in the briefs that because the New York Defendants—Arween, Mandeep, Neewra, Rednihom and Aref—have defaulted in the current action, the court should analyze the *forum non conveniens* issue as if those Defendants did not exist. Joginder Mem. at 16. This suggestion ignores the fact that the New York conduct of the New York Defendants is a crucial part of the alleged liability of the Kuwaiti Defendants. That is, I am not faced with a case where the only relevant activity took place abroad, and wherein foreign law is likely to apply. Rather, the New York law governing the New York contracts will be relevant for every Kuwaiti Defendant found to be bound by the contracts. Further, the fraudulent mis-

representations made by Arween and Mandeep through Aref, Neewra and Rednihom in New York will remain relevant insofar as they are imputed to the moving Defendants under either an agency or conspiracy rationale.

Thus, I will not view this motion as if the conduct of the defaulting New York Defendants were irrelevant, for the simple reason that it is not. With this firmly in mind, I proceed to the *forum non conveniens* analysis proper.

### i. Standard

"The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). In *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001), the Second Circuit, sitting *en banc*, adopted a three-part inquiry to govern analyses of motions to dismiss for *forum non conveniens. See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir.2005): *see also Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir.2003); *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir.2002). "The defendant bears the burden to establish clearly each factor ... and to demonstrate that the balance tilts strongly in favor of the purported alternative forum." *PT United Can Co., Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 74 (2d Cir.1998) (internal citations omitted).

The first step in a *forum non conveniens* analysis is determining what level of deference to accord a plaintiff's choice of forum. *DiRienzo*, 294 F.3d at 28 (citing *Iragorri*, 274 F.3d at 73). After this is decided, a court must consider whether there exists an adequate alternative forum for the litigation. *Iragorri*, 274 F.3d at 73. If one exists, a court must then weigh the relative convenience of the forums by evaluating certain private and public interest factors. *Id.* "The greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing forum non conveniens dismissal." *Id.* at 74.

### ii. Plaintiffs' choice of forum is entitled to substantial deference

The Second Circuit has established a "sliding scale" approach to determine the degree of deference to accord a plaintiff's choice of forum. *Id.* at 71. Under that scale,

> the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States ... [the greater deference must be accorded the plaintiff's choice of a forum, and] the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*

*Id.* at 72.

Factors to be considered include: "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.* On the other side of the equation, circumstances "generally indicative of forum shopping," *see Norex*, 416 F.3d at 155, include "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the re-

gion, or the inconvenience and expense to the defendant resulting from litigation in that forum." *Iragorri,* 274 F.3d at 72.

A district court is not required to consider every single factor specifically in making this determination. *Norex,* 416 F.3d at 155. Where the plaintiff's choice is determined to stem more from concerns of convenience, it is entitled to greater deference; where the choice indicates forum-shopping, it is entitled to less deference. *Iragorri,* 274 F.3d at 71–72; *Strategic Value Master Fund Ltd. v. Cargill Fin. Servs., Corp.,* 421 F.Supp.2d 741, 755 (S.D.N.Y.2006).

Here, it is clear that Maersk's choice is entitled to substantial deference. Each fraud perpetrated on Maersk followed an ocean bill of lading, i.e., a maritime contract, signed in New York by two New York corporations, Aref/Neewra/Rednihom and Maersk, Inc. The contents of the Neewra and Rednihom shipping containers will be a crucial issue, and the evidence relevant to this question will be found either in New York or in New Jersey. For example, Seagate and Micro–Spy (U.S. companies) are both likely to be involved as witnesses with respect to the Neewra shipment. Further, Maersk, Inc. is a New York corporation. While actual citizenship in the chosen forum is neither a necessary nor sufficient condition on receiving deference, it does cut in Maersk's favor.

Mohinder's argument that Maersk, Inc. should not be considered a plaintiff for the purposes of the *forum non conveniens* deference analysis is difficult to comprehend. For instance, Mohinder makes the argument that Moller–Maersk, the international corporation, states claims against him, but that Maersk, Inc., the New York affiliate, does not. Mohinder's Reply at 2–3. This is supposedly due to the fact that Maersk, Inc. entered into the shipping contracts with the New York Defendants as an agent for a disclosed principal, namely Moller–Maersk. *Id.* at 3. (citing *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,* 462 F.2d 673, 678 (2d Cir. 1972) for the proposition that an agent who enters into a shipping contract as an agent for a disclosed principal is not a party to the shipping contract.). However, Mohinder's reliance on *Interocean* is strange, as that case decided that the question of whether the supposed agent was a party to the charter agreement could not be decided as a matter of law on the record before the court. *Id.* (reversing an remanding for full trial to determine whether or not agent was a party to the charter agreement). In any event, Plaintiffs here allege that Maersk, Inc. suffered damages as a result of Mohinder's (and the other Defendants') actions. These damages need not be limited to the those arising from Defendants' alleged breach of the shipping contracts, though even if they were, it would be premature at this stage to resolve the factual question against Plaintiffs' good faith allegations. That is, I will not decide as a matter of law that Maersk, Inc. suffered no damages in order to decide this *forum non conveniens* motion.

On the other side of the equation, there is little in Plaintiffs' choice of forum that suggests forum shopping. Although the Kuwaiti Defendants will be put to some expense in defending the lawsuit here, New York was a more generous choice with respect to the defaulting New York Defendants. Further, Maersk has offered to depose the Kuwaiti Defendants in a more convenient location, such as London. Both of these facts suggest that Maersk did not choose this forum to be vexatious. To the extent that the shipping contracts bind some Defendants, and that the New York fraudulent activities are imputed to some Defendants, either New York or U.S.

federal maritime law should control, so that Maersk does not gain a substantive advantage by litigating here.

Thus, I conclude that the circumstances here indicate that Maersk's choice of forum was made more from considerations of convenience than from forum-shopping. Plaintiffs' choice will accordingly be afforded greater deference, and Defendants' burden on this *forum non conveniens* motion will be correspondingly more onerous.

### iii. Alternative forum

■■■■■■ The next step in the *Gilbert* analysis is determining the existence of "a presently available alternative forum in which plaintiff can litigate its claim." *Norex*, 416 F.3d at 160; *see also Iragorri*, 274 F.3d at 73. The defendants bear the burden of establishing the existence of an adequate alternative forum. *USHA (India), Ltd. v. Honeywell Intl. Inc.*, 421 F.3d 129, 135 (2d Cir.2005) (citing *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476 (2d Cir. 2002)); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000). "An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir.2001) (internal quotation and citations omitted). "'In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative ...'" *Aguinda*, 303 F.3d at 476–77 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)).

Defendants suggest that Kuwait is an adequate alternative forum, and I agree with them. There has been some suggestion that because of the Singh Sahni family's power in Kuwait, it would be difficult, or even impossible, to secure witnesses willing to testify. However, as I recently pointed out, I am loath to impugn the integrity or efficacy of the courts of a foreign jurisdiction. *Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG*, 535 F.Supp.2d 403, 411–12 (S.D.N.Y. 2008).

In any event, the existence of an adequate alternative is merely a necessary condition for obtaining *forum non conveniens* dismissal. Here, the availability and adequacy of the Kuwaiti courts do not change the outcome, because—as will be seen—the private and public interest factors do not overcome the deference owed to Maersk's choice of forum, and even point in favor of that choice.

### iv. Balancing factors

■■■■ The last step in assessing the convenience of plaintiff's chosen forum is to balance the factors identified by the Supreme Court in *Gilbert*: the private interest factors reflecting the interests of the parties at bar and the public interest factors reflecting the interests of the public. To prevail, a defendant normally has the burden to demonstrate that both the private and public interest factors "strongly" favor dismissal. *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, 2006 WL 3230301, at *5 (S.D.N.Y. Nov.7, 2006) (quoting *DiRienzo*, 294 F.3d at 30–31). Where, as here, Plaintiffs' choice is entitled to substantial deference, Defendants' task is that much harder.

The Second Circuit has endorsed the use of the non-exclusive list of private and public interest factors delineated in *Gilbert* to evaluate a *forum non conveniens* motion. The private interest factors include: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process

for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive. *Iragorri*, 274 F.3d at 73–74.

The public interest factors include: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community. *Id.* at 74; *see also Gilbert*, 330 U.S. at 508, 67 S.Ct. 839.

Here, the private interest factors split somewhat evenly between the parties, while the public interest factors favor New York. Thus, even in the absence of the substantial deference owed Maersk's choice of forum, New York appears to be the more convenient forum to litigate this dispute.

### 1. *Private interest*

As noted, the private interest factors include: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive. *Iragorri*, 274 F.3d at 73–74.

As to (1), the relevant evidence is spread all over the world. A great deal of the conduct complained of occurred in Kuwait. Likewise, a great deal of the conduct occurred in New York and New Jersey. Some evidence—relating to the Tire Fraud—may be found in India. Maersk makes the argument that most of the relevant documents that were originally written in Arabic have already been translated into English, while most of the documents written in English would still need to be translated into Arabic if a Kuwaiti court were to decide this action. On the other hand, it is likely that the Kuwaiti court already has some of the relevant evidence before it, in light of the ongoing criminal investigation against Neewra and company in Kuwait.

Thus, it appears that the first factor does not cleave exclusively in one direction or the other. Even assuming it favors the moving Defendants, it would do so only slightly.

Likewise, the second factor—the cost of witness transportation—cuts both ways. This is because, like the relevant evidence, the relevant witnesses are spread across the world. The inevitable costs associated with this aspect of the suit can be alleviated under U.S. law by the submission of letters rogatory and the availability of videotaped depositions. I have not been made aware of analogous procedures under Kuwaiti law, though they may exist. As noted above, Maersk has also offered to depose the Kuwaiti Defendants abroad, which would reduce potential costs.

Thus, the second factor appears to favor New York as a forum for this suit, though again, the issue is close.

The third factor, the availability of compulsory process for unwilling witnesses, seems to favor Kuwait, if only because some of the New York witnesses affiliated with Maersk would be willing to appear anywhere, while the same might not be said for Kuwaiti witnesses affiliated with the Defendants. On the other hand, there may be some witnesses in the U.S. who would not wish to testify in Kuwait, such as any of Arween and Mandeep's co-conspirators in packing the fraudulent Neewra and Rednihom shipments, or faking the Micro–Spy invoice.

Still, litigation in New York will present the problem of those Kuwaiti witnesses who are unwilling to submit to jurisdiction in New York. This is a significant problem, although it is perhaps mitigated by the fact that some of those unwilling to testify,

for whatever reason, will also be unwilling to testify in Kuwait as well.

In the end, this factor presents some reason to believe that litigation in Kuwait might be more convenient.

The final private interest factor is a catchall for any considerations that would make litigation in one forum or another less costly and more convenient to the parties. Defendants argue that because proceedings are already ongoing against them in Kuwait, it would be more convenient for Maersk to litigate there. The problem with this argument is that the proceedings against the Defendants are criminal proceedings, for which Maersk stands to recover nothing. Maersk has deliberately foregone bringing a civil action against the foreign Defendants in Kuwait, and Plaintiffs should not have their choice of a civil forum undermined by the Kuwaiti authority's decision to investigate the Singh Sahni enterprise there.

It appears that, on balance, the private interest factors do not significantly favor Kuwait as the more convenient forum in which to litigate this dispute.

## 2. *Public interest*

The public interest factors include: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community. *Iragorri*, 274 F.3d at 74; *see also Gilbert*, 330 U.S. at 508, 67 S.Ct. 839.

This dispute is international in nature. It involves alleged bad behavior both in the New York and Kuwait, as well as elsewhere. Still, there is reason to think that the dispute is more firmly situated in New York. New York corporations and contracts were utilized to perpetrate this fraud. It is relevant that there are no Kuwaiti victims in this suit, while there is at least one New York victim. Finally, much of the conduct complained of—which is imputed to the Kuwaiti Defendants as principals or co-conspirators—occurred in New York, and thus, New York has an interest in uncovering and deterring these types of frauds within its borders. Finally, to the extent that Kuwait has similar interests in uncovering this fraudulent conspiracy, the public authorities in Kuwait are apparently pursuing that interest through its investigation of the frauds in Kuwait.

The second factor requires a determination of which law will apply. As to Mohinder and Joginder, this appears be the law of the United States, as they are bound by the various shipping contracts. As to Parkar and Help Line, the issue is less clear, although to the extent that they are liable as co-conspirators of the New York Defendants, it would appear that their liability would also turn on New York, rather than Kuwaiti, law.

Joginder claims that the "law that should be applied ... under standard choice of law principles, is that of Kuwait." Joginder Mem. at 16 (citing *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998)). However, this argument appears based on the misconception, alluded to above, that the conduct of the defaulting New York Defendants should not be relevant to this motion. Under that assumption, the locus of the tort, i.e., fraud, which is a crucial factor in the choice-of-law analysis, might appear to be Kuwait.

However, as discussed above, the New York conduct of the New York Defendants remains relevant to the causes of action against the moving Defendants. With that conduct in mind, the locus of the fraud would appear to be New York, and hence, New York conflict of laws principles would appear to favor the application of New

York, rather than Kuwaiti, law. And of course, to the extent that some Defendants are bound by the maritime contracts, U.S. federal maritime law, or the law called for in those contracts (i.e., New York law) will apply. Needless to say, this is law with which this court is familiar.

Finally, it does not appear that either New York or Kuwaiti jurors will be forced to determine the outcome of a suit in which they have no interest. As to the New York jurors, the outcome of this suit will have a significant impact on would-be shipping fraudsters in New York, which is a major international shipping port. The business created by these ports is undoubtedly important to New Yorkers, who choose to live here both due to the lucrative opportunities in international trade and to enjoy the diversity that New York's being a large international port creates for its citizens.

Of course none of this is to disparage the interests that Kuwaiti citizens who might serve on civil juries would have in the outcome of this suit. But it must be noted that the relevant question is not which community has the greater interest (as that is considered under the public interest factor (1)), but whether a juror in New York would be forced to decide a case with no impact on his community. That is clearly not the case here.

In conclusion, the private and public interest factors point at times in favor of Kuwait, and at times in favor of New York, with the balance tipping somewhat in New York's favor. The best that could be said for Defendants is that the factors are in equipoise. However, such equipoise would be fatal to Defendants motion even in the absence of substantial deference being afforded Plaintiffs' choice. "[A] lesser degree of deference to the plaintiff's choice ... does not guarantee dismissal.... The action should be dismissed only if the cho-

sen forum is shown to be *genuinely inconvenient* and the [alternative] forum *significantly preferable.*" *Iragorri,* 274 F.3d at 74–75 (emphasis added). There is simply no basis to conclude that New York would be genuinely inconvenient, and there is likewise no basis to conclude that Kuwait would be significantly preferable.

Thus, Defendant's motion fails even on a standard less deferential to a plaintiff's choice. Under the proper, more deferential, standard, the issue is not even close.

v. What about *Sinochem?*

Finally, I agree with the Defendants that Maersk has not adequately addressed the Supreme Court's unanimous decision in *Sinochem International Co., Ltd. v. Malaysia International Shipping Corp.,* —— U.S. ——, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). However, *Sinochem* is readily distinguishable from this case.

In *Sinochem,* a foreign plaintiff, Malaysia International, brought suit against Sinochem, a foreign Defendant, in the Eastern District of Pennsylvania. *Id.* at 1188. Malaysia International's claim was that Sinochem had caused its ship to be falsely arrested in China, and that Sinochem then defrauded a Chinese admiralty court, thereby causing delay damages to Malaysia International's shipping business. *Id.* at 1189.

The District Court judge dismissed the complaint on the ground of *forum non conveniens,* but was reversed by the Third Circuit for failing to determine whether it had both personal and subject matter jurisdiction before dismissing on *forum non conveniens* grounds. *Id.* The Supreme Court reversed the Third Circuit, holding, inter alia, that the case presented a "textbook case for *immediate forum non conveniens* dismissal." *Id.* at 1190, 1194 (emphasis added).

As an initial matter, Defendants appear to make much of the "textbook case" language, ignoring the context in which that language is used. Immediately after stating that Sinochem presented a textbook case for "immediate" dismissal, the Court explained that resolution of the open question of law that determined the subject matter jurisdictional issue, as well as the extensive and costly discovery it would take to resolve the personal jurisdiction issue, made the case an apt example of why its newly announced rule (i.e., consider *forum non conveniens* before deciding issues of jurisdiction) made sense. *Id.* at 1194. Rather than having to perform these difficult and costly tasks, as the Third Circuit would have required, the District Court should be entitled to dismiss an action more conveniently litigated elsewhere "immediately." Thus, it is clear that *Sinochem* is "textbook" for the Court's rule regarding dismissal prior to determination of jurisdiction.

Defendant's argument that *Sinochem* presents a compelling factual analogy to our case seems once again founded on the hypothesis that because the New York Defendants have defaulted, their activities are no longer relevant to the resolution of this suit against the Kuwaiti Defendants. I say again, I disagree with this hypothesis. The New York activities of the New York Defendants were allegedly undertaken on behalf of the Kuwaiti Defendants. This case is far more than a case about a fraudulent claim on a foreign court regarding a vessel wrongfully arrested overseas. *Sinochem* involved a foreign plaintiff suing a foreign defendant about a single alleged fraud, which took place overseas. Here, we have at least one domestic Plaintiff suing at least five domestic Defendants, who are allegedly connected in an international conspiracy with the foreign Defendants, regarding a series of domestic and international frauds.

I readily acknowledge that, if this case concerned only the Neewra fraud—and indeed, only activities relating to that fraud that occurred in Kuwait—*Sinochem* would command dismissal on *forum non conveniens* grounds. The plaintiff would be foreign, and his choice of forum would be entitled to less deference; the costs associated with the documentary evidence and witnesses would be far less abroad; and the interest of the chosen forum and its jurors would also favor litigation abroad, where all the relevant conduct occurred.

However, that is not the case I have before me. The case before me alleges an international conspiracy to commit a shipping fraud, which was carried out across the globe, though largely in New York by agents or co-conspirators of the Kuwaiti Defendants. As demonstrated, Plaintiffs' choice of forum is entitled to deference, and even if it were not, the interest factors are equivocal, or favor Maersk. Thus, *Sinochem* does not change the analysis here.

For these reasons, both motions to dismiss on the grounds of *forum non conveniens* are denied.

### c. Mohinder's remaining arguments

Mohinder moves alone on a number of additional grounds. First, Mohinder argues that Maersk has failed to meet the pleading standard set out in Federal Rule of Civil Procedure 9(b) for allegations of fraud. Second, Mohinder argues that the failure to meet Rule 9 standards also dooms Plaintiffs' RICO claim. Finally, Mohinder makes a number of mostly meritless arguments, collectively referred to as the Kitchen Sink.

These arguments are addressed in turn.

### i. Fraud

Mohinder's first argument is that Plaintiffs have failed to plead common law fraud

and conspiracy to commit fraud with particularity as to him. Mohinder's Mem. at 8–14.

■ "Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir.2001) (citing *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

■ "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To satisfy Rule 9(b), plaintiff must "specifically plead those events which give rise to a strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Conn. Nat'l Bank v. Fluor,* 808 F.2d 957, 962 (2d Cir.1987) (internal quotation and citations omitted); *see also S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996) (a fraud claim "must allege facts that give rise to a strong inference of fraudulent intent"). "Such intent can be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Util. Co.,* 228 F.3d 154, 168–69 (2d Cir.2000).

■ However, allegations regarding the knowledge of the other participants and their roles, and the state of mind of the participants can be alleged generally. *See* Fed.R.Civ.P. 9(b) ("Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."). "Thus, while the actual . . . fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity. . . . We apply the more general standard to scienter for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Wight v. BankAmerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000) (quotations and citations omitted).

■ Plaintiffs' allegations as to Mohinder also sound in the distinct tort of common law conspiracy to commit fraud. In order to plead the conspiracy, "it is important that within the pleader's ability to do so, and without going into unnecessary detail, the opposing party be informed of the nature of the conspiracy charged. . . . Where possible, there should be some details of time and place and the alleged effect of the conspiracy . . . Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *Banks v. Consumer Home Mortg., Inc.,* 2003 WL 21251584, at *5 (E.D.N.Y. March 28, 2003) (quoting *777388 Ontario Ltd. v. Lencore Acoustics Corp.,* 142 F.Supp.2d 309, 319 n. 4 (E.D.N.Y.2001)). With that pleading standard in mind, in order to plead a cause of action for conspiracy to commit fraud, "a plaintiff in New York must allege the primary [fraud] and four elements: (a) a corrupt agreement between two or more persons; (b) an overt act in furtherance of the agreement; (c) the parties' intentional participation in the furtherance of a plan or purpose; and (d) the resulting damage or injury." *Ontario,* 142 F.Supp.2d at 319.

Although the Complaint is less than pellucid on this score, it can fairly be read to allege three particularized underlying

frauds, and to plead a common law conspiracy involving Mohinder. The facts underlying the Tire, Neewra and Rednihom frauds are pleaded with a great deal of particularity. For example, with respect to the Tire Fraud, Plaintiffs allege (1) that Arween made a false statement of material fact, namely that Golden Trader or Poonanam would accept the tire shipments in India, Compl. ¶¶ 28, 38; (2) that Arween knew the statement was false, *id.* ¶¶ 29, 38; (3) that Arween knowingly made the false statements in order to induce Maersk to take the shipments, *id.* ¶ 29; (4) that Maersk relied on Arween's statements when it undertook the shipments, *id.* ¶¶ 31, 37; and (5) that Maersk was injured by virtue of its reliance, *Id.* ¶¶ 46–50. Thus, Maersk has alleged with particularity a common law fraud arising out of the Tire Shipment.

Likewise, the allegations regarding the Neewra fraud are made with particularity. The Complaint can be fairly read to allege that (1) Arween made a false statement of material fact when he informed Maersk that he had sent the original bill of lading to al Tamasok in Kuwait, Compl. ¶ 77; (2) that Arween knew the statement was false when he made it, *id.*; (3) that Arween made the false statement with the purpose of inducing Maersk to release the container and the security for the forged bill of lading; (4) that Maersk relied at least in part on Arween's representation that the bill of lading had been sent when it accepted the fraudulent bill of lading; and (5) that Maersk was injured through its reliance. Thus, Maersk has also alleged with particularity an underlying fraud related to the Neewra shipment.

Finally, with respect to the Rednihom shipment, Plaintiff alleges that (1) Mohinder or Mandeep made a false statement when it told Maersk it was shipping PC parts to a consignee in Kuwait; (2) that

Mandeep or Mohinder knew the statement was false when he made it; (3) that Mohinder or Mandeep made the false statement for the purposing of inducing Maersk to ship what was actually used car parts to a non-existent consignee, with the purpose of presenting a fraudulent claim against Maersk; (4) that Maersk relied on these representations when it shipped and stored the containers; and (5) that Maersk was injured as a result of its reliance, insofar as it has not been paid for the freight or the storage of the abandoned shipment.

It is therefore clear that Maersk has alleged the underlying frauds with sufficient particularity, and any argument to the contrary is without merit.

■ Rather, Mohinder's argument is that he has not been sufficiently tied to the frauds alleged against the New York Defendants. However, it is not necessary that Plaintiffs allege all of the same elements against each member of a conspiracy to defraud. *See Banks,* 2003 WL 21251584 at *6 ("When affirmative statements are made by agents of another, the principal can be held liable. 'In actions for fraud, corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally.'") (quoting *Polonetsky v. Better Homes Depot, Inc.,* 97 N.Y.2d 46, 735 N.Y.S.2d 479, 760 N.E.2d 1274, 1278 (2001)). As noted above, it is enough to plead—with particularity—the underlying fraud, and to plead "(a) a corrupt agreement between two or more persons; (b) an overt act in furtherance of the agreement; (c) the parties' intentional participation in the furtherance of a plan or purpose; and (d) the resulting damage or injury." *Ontario,* 142 F.Supp.2d at 319. Although there appears to be some uncertainty on this issue, it is the law of the Second Circuit that while

fraud must be alleged with particularity, the facts constituting a conspiracy need not. *See Andre Emmerich Gallery, Inc. v. Segre,* 1997 WL 672009, at *8 (S.D.N.Y. Oct.29, 1997) ("pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a).") (citing *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990)). *But see JP Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247, 252 n. 3 (S.D.N.Y. 2005) (noting varying approaches to the question of whether conspiracy allegations must meet Rule 9(b) or Rule 8(a)).

Plaintiffs have clearly pleaded a corrupt agreement which included the New York Defendants and Mohinder; they have pleaded Mohinder's exercise of control or authorization—as well as his possible presence at the 2004 Neewra Meeting in Kuwait—as overt acts in furtherance of the agreement and as evidencing Mohinder intentional participation in the agreement; and they have pleaded their damages. Therefore, they have pleaded all of the necessary elements of a conspiracy. In addition, Plaintiffs have pleaded that Arween and Mandeep made material misrepresentations while acting as agents for Mohinder. *See* supra Part III.a.i.

The case is strikingly similar to *Banks,* 2003 WL 21251584 at *1. In that case, plaintiffs alleged a conspiracy to defraud on the basis of material misrepresentations made by a real estate broker, an appraiser, and a variety of other Defendants, including an attorney named Jason Ashley. The plaintiffs also alleged that Mindy and Michael Ashley—with whom plaintiffs had no direct contact whatsoever—exerted control over the scheme as principals of those defendants that had made the false representations.

After Jason Ashley—one of the defendants alleged to have made the fraudulent statements—defaulted in the action, Mindy and Michael moved to dismiss, making virtually the exact same argument Mohinder makes here. Rather than attack the particularity of the underlying frauds (which Mohinder attempts unsuccessfully here), those defendants contested the sufficiency of the plaintiffs' allegations that "Michael ... controls directly or indirectly" other defendants named in the fraud, and that Mindy was an officer of one of the named corporate defendants.

Rejecting these arguments, Judge Glasser held that

> the failure to plead with particularity specific fraudulent statements from or actions taken by the Ashleys is not fatal to the claims. In this case, the complaint makes clear that the liability of the Ashleys is predicated upon directing or exerting substantial control over [the other defendants], as well as acting with the other defendants to carry out the alleged fraud.

*Id.* at *7. As with the Ashleys, there is significant evidence, some of it circumstantial, to establish Mohinder's knowledge of the alleged frauds. *See* supra, Part III.a.i; *Maersk, Inc. v. Neewra, Inc.,* 443 F.Supp.2d 519 (S.D.N.Y.2006) (RCC) ("Together with the complaint, Plaintiff's extrinsic allegations and evidence provide reasonable grounds to believe that [Mohinder] was a principal of Neewra, Rednihom and [Aref].").

Nor does this decision run afoul of the requirement that Plaintiffs connect the allegations of fraud to each individual defendant. *See, e.g., NCA Holding Corp. v. Ernestus,* 1998 WL 229510, at *3 (S.D.N.Y. May 7, 1998) ("General allegations that the defendants 'conspired' in the scheme do no sufficiently attribute responsibility for fraud to each individual defendant") (quoting *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213,

230 (S.D.N.Y.1992)). This requirement stems from the same purposes underlying the higher pleading standard for fraud. Those purposes include informing the defendant of the specific allegations against him so that he can prepare a responsive pleading. *Center Cadillac*, 808 F.Supp. at 228–29 ("Rule 9(b) is satisfied if the complaint gives enough information to enable defendants to frame a responsive pleading and assures a sufficient basis exists for the allegations made."). Assuring that a sufficient basis for the allegations exists in turn serves the purposes of protecting a defendant's reputation and deterring the initiation of so-called "strike suits," i.e., frivolous claims instituted with the sole purpose of forcing a defendant to settle rather than face the bad publicity associated with an accusation of fraud. *See generally DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) ("Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits.").

All of these purposes are adequately served by the specificity of the pleadings, both with respect to the nature of the fraudulent conspiracy, and Mohinder's alleged role in it. Mohinder is clearly on notice as to his alleged role and the conduct that is the purported basis of his liability to Plaintiffs, Further, Mohinder's reputation, to the extent that he has one in the United States, will be protected by his defense, which will surely be an attempt to distance Mohinder from the schemes allegedly carried out by younger generation of Singh Sahnis in North America. Finally, the wealth of information already gathered by Maersk makes it clear that their allegations of fraud are by no means frivolous, and that their inclusion of Mohinder in the complaint is not based on rank speculation or mere guilt by association. *See Maersk*, 443 F.Supp.2d at 529–31.

For the foregoing reasons, I find that Maersk has pleaded all three frauds with particularity, and has done enough—at this stage—to tie Mohinder to those frauds. As a result, Mohinder's argument for dismissal on this ground must be rejected.

### ii. RICO

Mohinder next argues that Plaintiffs have failed to state a claim against him under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, so that this cause of action must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

#### 1. Standard

On a motion to dismiss, the court must accept all factual allegations in the complaint as true. *In re Xethanol Corp. Secs. Litig.*, 2007 WL 2572088, at *2 (S.D.N.Y. Sept.7, 2007) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, — U.S. —, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). The *Conley v. Gibson standard*, which held that dismissal is inappropriate "unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), was recently "retired" by the Supreme Court in *Bell Atlantic v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). For a plaintiff to survive a motion to dismiss, he must provide "the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation and internal quotation omitted). In applying

this standard, I must read the facts alleged in the complaint in the light most favorable to petitioners.

"To state a claim under civil RICO, a plaintiff must plead seven elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Berk v. Tradewell, Inc.*, 2003 WL 21664679, at *11 (S.D.N.Y. July 16, 2003) (MBM) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983)): *see also* 18 U.S.C. § 1962(a)-(c).

▮▮▮▮ Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of § 1962(a)-(c), To state a conspiracy claim, a plaintiff must allege that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise." *Colony at Holbrook, Inc. v. Strata, G.C., Inc.*, 928 F.Supp. 1224, 1238 (E.D.N.Y.1996) (internal citation and quotation omitted). There can be no RICO conspiracy without a substantive RICO violation. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir.2004) (citing *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."); *see also Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y.1996) ("Failure to ade-

quately plead facts that would satisfy the pleading requirements of 1962(a), 1962(b) or 1962(c) necessarily dooms any claims that the [plaintiff] might assert arising under 1962(d).").

2. Predicate acts

The first thing Plaintiffs must allege is that Mohinder engaged in a pattern of racketeering activity. That is, Plaintiffs must provide "at the very least a showing that defendants committed two acts of racketeering activity within a ten-year period." *Eastchester Rehabilitation and Health Care Ctr., L.L.C. v. Eastchester Health Care Ctr.*, 2005 WL 887154, at *5 (S.D.N.Y. April 15, 2005) (citing 18 U.S.C. § 1961(5)); *see also First Capital*, 385 F.3d at 178. Plaintiffs variously allege as their RICO predicates violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512 (witness tampering) against the various named Defendants, Plaintiffs also allege violations of each of these sections against Mohinder specifically. Pl.'s Opp. (Mohinder) at 16–18.

▮▮▮▮ To prove a violation of the wire fraud statute,[4] plaintiffs must establish the existence of a fraudulent scheme and a wire communication in furtherance of the scheme. *See Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). While there is no requirement that the defendant personally mail a letter [or make a call], the plaintiff must show "1) that the defendant 'caused' the mailing [or call] ... and 2) that the mailing [or call] was for the purpose of executing the

---

4. The elements of mail and wire fraud are identical, so that the crimes differ only according to the medium used to convey the fraudulent message. *See generally* I White Collar Crime § 8:2 (2d ed.). The Complaint includes allegations of fraudulent messages made in both media. Thus, the following discussion of wire fraud applies *mutatis mutandis* to the allegations of wire fraud, when phone/fax rather than print is involved.

scheme or ... 'incidental to an essential part of the scheme.'" *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira,* 347 U.S. at 8–9, 74 S.Ct. 358).

As previously noted, allegations of mail or wire fraud must be made with the particularity required by Rule 9(b). *Celpaco, Inc. v. MD Papierfabriken,* 686 F.Supp. 983, 989 (D.Conn.1988). Pursuant to this higher pleading standard, the "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Plaintiffs asserting mail or wire fraud must also identify the purpose of the wiring or mailing within the defendant's fraudulent scheme. *See Sun Sav. & Loan Assoc. v. Dierdorff,* 825 F.2d 187, 196 (9th Cir.1987) (mail fraud adequately pled where complaint described letters' date, content, origin, destination, and role in fraudulent scheme); *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990) (dismissing complaint that failed to allege how misrepresentations furthered fraudulent scheme); *Celpaco, Inc.,* 686 F.Supp. at 989.

Here, the allegations of mail and wire fraud are clearly made out as to the New York Defendants. Plaintiffs allege a series of fraudulent misrepresentations made via telephone and fax, including the phone calls made by Arween to set up the tire shipments, the phone call made by Arween to induce Maersk to release the Neewra shipment in exchange for al Tamasok's security, the fax messages sent by Mandeep attempting to secure the diversion of the Rednihom shipment, and others. Thus, Plaintiffs have adequately alleged the fraudulent nature of the mail or wire communications, the time periods in which they were made, why those communications were false, the purpose of those false communications, and the role of the communications in the overall scheme to defraud.

However, because the Plaintiffs do not allege that Mohinder himself made these fraudulent mailings and phone calls, Plaintiffs must allege, with particularity, that Mohinder "caused" the fraudulent mailings and calls in order to show that Mohinder violated sections 1341 and 1343. That is, Plaintiffs must allege that Mohinder acted "with knowledge that the use of the mails [or wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Bortnovsky,* 879 F.2d at 36 (quoting *Pereira,* 347 U.S. at 8–9, 74 S.Ct. 358). Put another way, Mohinder may be liable if he had the intent to defraud, and with that intent acted in some way to cause the fraudulent mailings or phone calls, or acted in such a way that he must have known the fraudulent mailings or phone calls would follow.

I find that Plaintiffs have alleged a causal role in the fraudulent mailings and wire communications, particularly through their well-pleaded allegations of Mohinder's participation in a common law conspiracy to commit fraud, as either a principal or co-conspirator of the New York Defendants. *See supra,* Parts III.a.i, III.c.i. For example, Mohinder is alleged to have lent his identity to Arween and Mandeep in furtherance of these frauds. In a number of the communications by which Arween or Mandeep violated § 1341 and § 1343, they represented themselves as Mohinder. Mohinder is also alleged to be a "cause" of the fraudulent communications in a more direct manner, namely by instructing the issuance of these communications while acting as a principal of the New York

Defendants. The many detailed allegations that plead this complex international conspiracy suffice to meet the particularity requirements, and to sufficiently tie Mohinder in to the scheme. Needless to say, Mohinder's suspicious behavior before Judge Casey also lends credence to these allegations.

■ Plaintiffs have alleged more than two predicate acts which satisfy the definition of a "pattern of racketeering activity," namely Mohinder's violation of sections 1341 and 1343. Because these acts spanned more than two years, they exhibit the kind of ongoing threat of illegal action described as close-ended continuity. *See, e.g., DeFalco v. Bernas,* 244 F.3d 286, 321 (2d Cir.2001) (Closed-ended continuity is demonstrated by showing a series of related predicates extending over a substantial period of time). On the assumption that this scheme is ongoing, the inherently illegal nature and purposes of the alleged enterprise also satisfy so-called open-ended continuity. *See, e.g., GICC Capital Corp. v. Technology Fin. Group, Inc.,* 67 F.3d 463, 466 (2d Cir.1995) (Inherently unlawful acts conducted for an enterprise in the business of racketeering activity constitute a threat of future criminal activity and are thus sufficient to form the basis of a claim of open-ended continuity).

### 3. Enterprise

To hold Mohinder liable, Plaintiffs must additionally establish an "enterprise" in which Mohinder participated through these acts, or a conspiracy to commit the RICO violations. Mohinder challenges the sufficiency of the allegations that there is a RICO enterprise in this case. Mohinder's Mem. at 16.

■ The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has stated that a "group of individuals associated in fact" refers to "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *First Nationwide Bank v. Gelt Funding Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993) (stating that associated entities "must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes"). The touchstone of such a racketeering enterprise is "an ongoing organization, formal or informal" with "various associates function as a continuing unit." *Id.* Courts in the Second Circuit look to the "hierarchy, organization, and activities" of an alleged association-in-fact to determine whether its members functioned as a unit. *United States v. Coonan,* 938 F.2d 1553, 1560 (2d Cir.1991).

■ Mohinder's argument against the existence of an enterprise is without merit. If anything, Plaintiffs have pleaded an enterprise of such sophistication and ominously pervasive reach that this court struggled to believe in such an elaborate and sinister operation. *See* supra, Part III.a.i. Thus, Plaintiffs have done far more than simply string a series of defendants together and label it an enterprise. *Compare Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.,* 165 F.Supp.2d 514, 539 (S.D.N.Y.2001). Rather, they have asserted a hierarchy, with Mohinder and Joginder at the top, running—either personally or through their agents a number of corporations, which operate across the world to perpetrate frauds both on the sending and receiving ends of shipments. Plaintiffs have alleged a compelling modus operandi involving shifting identities, dummy corporations, and fraudulent legal

claims on carriers. Mohinder's brief makes the feeble accusation that Plaintiffs merely "restate the legal standard in an attempt to allege an enterprise." Mohinder's Mem. at 16. Rather, it appears to be Mohinder's lawyers who have merely restated a boilerplate argument against the allegation of a RICO enterprise that clearly has no application to the well-pleaded facts of the case.

#### 4. Conspiracy

As noted, there is an alternative ground for liability if Plaintiffs have sufficiently pleaded a RICO conspiracy involving Mohinder. To state a conspiracy claim, a plaintiff must allege that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise." *Colony at Holbrook,* 928 F.Supp. at 1238. I have already found that Plaintiffs have adequately alleged a conspiracy—involving, among others, Mohinder and the New York Defendants—to commit the very frauds that are the predicate acts of the RICO scheme. Thus, Plaintiffs have also properly pleaded a RICO conspiracy claim under § 1961(d) against Mohinder.

#### 5. Conclusion

In conclusion, Plaintiffs have sufficiently pleaded the existence of a RICO enterprise engaged in a continuous pattern of racketeering activity that affects foreign commerce. They have also alleged Mohinder's participation in that enterprise, both directly and as a co-conspirator. For this reason, the RICO count against Mohinder cannot be dismissed at this stage.

#### iii. The kitchen sink

Mohinder makes a number of other arguments and requests, all of which are without merit. They are disposed of summarily below.

#### 1. Res judicata

Mohinder argues that this court should treat as res judicata any claims relating to the $1.86M obtained through the Kuwait litigation.

"Under the doctrine of res judicata, or claim preclusion, 'A final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action.'" *EDP Med. Computer Sys., Inc. v. U.S.,* 480 F.3d 621, 624 (2d Cir.2007) (quoting *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir.2000)) (other citations and quotations omitted). Thus, the doctrine bars "later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Id.* (quoting *In re Teltronics Servs., Inc.,* 762 F.2d 185, 190 (2d Cir.1985)).

I cannot decide on the record currently before me whether or not the Kuwaiti judgment was "a final judgment on the merits." The submissions of the parties are in conflict on this point. Further, the issue of whether or not a fraud on the Kuwaiti court has been perpetrated—which is also crucial to Mohinder's argument—cannot be decided on the sparse records before me. It is also possible that the forum selection clause in Maersk's bill of lading vested this court with exclusive jurisdiction to hear all disputes arising out of the Neewra shipment, although it is not necessary to decide this question (and I will not).

The burden of establishing res judicata is on the moving party. *See, e.g., Greenberg v. Bd. of Governors of Fed.*

*Reserve Sys.*, 968 F.2d 164, 170 (2d Cir. 1992) (citing *American Fed. of Gov't Employees, Council 214, AFL–CIO v. Federal Labor Relations Authority*, 835 F.2d 1458, 1463 (D.C.Cir.1987)). Mohinder has not carried this burden. Thus, the motion to dismiss on this ground is rejected, with leave to renew the argument after discovery reveals the nature and full extent of the Kuwaiti proceedings.

### 2. Contract

Mohinder next argues that he cannot be liable for any damages arising from the maritime contracts between Neewra/Rednihom/Aref and Maersk, because the obligations imposed on principals under those contracts amount to obligations to pay the debt of another, and are therefore subject to New York's Statute of Frauds. *See* N.Y. Gen. Oblig. Law § 5–701.

As with many of Mohinder's other arguments, one hardly knows where to begin to address it. The parties disagree whether or not this is a suretyship for performance of the shipping contract, and hence subject to New York law and § 5–701, Mohinder's Mem. at 21; or whether this is a shipping contract between the New York Defendants and Maersk that is also binding on Mohinder, and hence subject to federal maritime law, which does not include a statute of frauds, Pl.'s Opp. (Mohinder) at 20–21. The parties also disagree over whether Mohinder can be liable only for freight and other uncollected charges, or whether Mohinder might be liable for all damages arising from the breach.

However, what does not appear to be in dispute is that the Southern District has repeatedly upheld the imposition of contract liability on principals under the exact same clause. *See Maersk, Inc. v. Royal Brands Int'l, Interforce Trading Inc.*, 2001 WL 456343 (S.D.N.Y. May 1, 2001) (LAP); *Maersk, Inc. v. Atcom Indus.*, 73 F.Supp.2d 387 (S.D.N.Y.1999) (JFK); *Maersk, Inc. v. Am. Midwest Commodities Exp. Cos.*, 1998 WL 473945 (S.D.N.Y. Aug.10, 1998) (NRB); *Maersk, Inc. v. Alan Mktg., Inc.*, 1998 WL 167323 (S.D.N.Y. Apr.10, 1998) (HB). Mohinder does not distinguish these cases.

In the absence of even an attempt to explain the result in the above-cited cases, all upholding the imposition of liability on principals of signatories to Maersk's standard bills of lading, I reject Mohinder's argument on the authority of those cases. Because I—and Judge Casey before me—have already found that Mohinder has been adequately alleged to be a principal of the New York Defendants in the formation of these contracts, Maersk has stated a contract claim against Mohinder pursuant to clause 14(4). The questions of the exact scope of his potential liability and the precise construction of that clause are not properly before me, and in any event are premature.

### 3. "Substantive" due process

Mohinder's final argument is that the assertion of admiralty jurisdiction over him on the basis of the maritime contract violates his "substantive due process" rights. Mohinder says he is not arguing that this court lacks subject-matter jurisdiction over him. Mohinder's Reply at 8 ("[This point] is not an attack on this Court's subject matter jurisdiction …"). Rather, his argument appears to be a renewal, of sorts, of his earlier argument that the assertion of personal jurisdiction over him does not comport with Due Process notions of "fair play and substantial justice," what Mohinder calls "substantive due process."

It appears that Mohinder is arguing that the assertion of *quasi in rem* jurisdiction over him, on the basis of the attachment of his ETF, runs afoul of Due Process under

the principles announced in *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Whatever merit this argument may have, it is based on the erroneous assumption that *in personam* jurisdiction over Mohinder on the basis of his engaging in a conspiracy to commit torts in New York has not be established. *See* supra, Part III.a.i.

Because an alternative basis for jurisdiction over Mohinder has been established, alone sufficient to call Mohinder to answer for his alleged misdeeds, there is no need to address Mohinder's argument under *Shaffer* (but see below).

### 4. Interlocutory appeal

Finally, Mohinder requests leave to file an interlocutory appeal in the event I find a valid contract claim against him, and that the assertion of personal jurisdiction over him does not violate his "substantive" due process rights, which I have. His motion is denied.

To certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) I must find that the order (1) involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) that an immediate appeal may materially advance the ultimate termination of the litigation. *Romea v. Heiberger & Assoc.*, 988 F.Supp. 715, 716 (S.D.N.Y.1998).

None of the three conditions is met. First, the question of whether *quasi in rem* jurisdiction over Mohinder—on the basis of his attached ETF—comports with Due Process is not controlling because, as noted, an alternative sufficient ground exists for asserting *in personam* jurisdiction over Mohinder. Second, there is not a substantial ground for disagreement with the conclusion that Mohinder has sufficient "minimum contacts" with New York—in light of his tortious activities carried out

through his agents—to satisfy the *Shaffer* standard. Finally, because this question is not controlling, an immediate appellate determination of it would do nothing to advance the termination of the litigation as to Mohinder.

Thus, Mohinder's motion for certification for interlocutory appeal is denied.

### IV. Conclusion

For the foregoing reasons, the case must go on.

Mohinder's motion is DENIED on all grounds.

The motion filed by Joginder, Parkar, Help Line, Sardar and Sardar Int'l is DENIED on all grounds as to all Defendants, except that the motion is GRANTED with respect to Sardar and Sardar Int'l pursuant to Federal Rule of Civil Procedure 12(b)(2).

The foregoing constitutes the decision and order of the court.

**Liuba MANKO, Plaintiff,**

v.

**DEUTSCHE BANK, Defendant.**

**No. 02 Civ. 10180(NRB).**

United States District Court,
S.D. New York.

March 28, 2008.

Liuba Manko, New York, NY, pro se.

James G. Murphy, Esq., Epstein Becker & Green, P.C., New York, NY, for Defendant.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Liuba Manko ("Manko") brought this action against Deutsche Bank AG New York ("Deutsche Bank") alleging violations of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e–2(a)(1), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, and the Equal Pay Act, 29 U.S.C. § 206(d), and an unlawful denial of severance benefits in contravention of Section 510 of the Employment Retirement Income Security Act ("ERISA"). On March 19, 2004, Judge Griesa of this Court granted in part Deutsche Bank's motion to dismiss the complaint, holding that Manko's age discrimination, religious discrimination and retaliation claims had not been exhausted before the Equal Employment Opportunity Commission ("EEOC") and that her Equal Pay Act claim was time-barred. *See Liuba Manko v. Deutsche Bank*, No. 02 Civ. 10180, 2004 WL 574659, 2004 U.S. Dist. LEXIS 4665 (Mar. 19, 2004). This opinion addresses Deutsche Bank's motion for summary judgment on the pending claims of gender and national original discrimination and unlawful denial of severance benefits.[1] For the reasons stated herein, Deutsche Bank's motion is granted in its entirety.

---

1. The parties were permitted to conduct discovery until March 31, 2007, almost three years from the date the answer was filed.

---

full benefit of the rule requiring liberal construction of briefs and other submissions filed by a *pro se* plaintiff who has not received advice of counsel. *See Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007). Nonetheless, we have recited most of Manko's specific assertions even when they do not have legal significance.